HENRY TOVMASSIAN, SBN 140388
LAW OFFICES OF HENRY TOVMASSIAN
14001 Ventura Boulevard
Sherman Oaks, CA 91423
Telephone: (818) 990-7722
Facsimile: (818) 450-3722

Attorneys for Plaintiffs
**JOSE BANDA, MANUEL BANDA**
and **LORENA BANDA**

FILED
CLERK, U.S. DISTRICT COURT

MAY 1 0 2013

CENTRAL DISTRICT OF CALIFORNIA
BY                                DEPUTY

## UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

JOSE BANDA, MANUEL BANDA
and LORENA BANDA

                    Plaintiffs,

          v.

ANTELOPE VALLEY UNION HIGH
SCHOOL DISTRICT,

                    Defendant.

CASE NO. CV13-03358-FFM

**COMPLAINT FOR ATTORNEYS'
FEES AND EXPENSES UNDER THE
INDIVIDUALS WITH DISABILITIES
EDUCATION ACT**

Plaintiffs, for a claim for relief against defendant, alleges as follows:

## INTRODUCTION

1.   Invoking this Court's jurisdiction pursuant to 20 U.S.C. § 1331, plaintiffs file this action to recover reasonable attorneys' fees and expenses incurred in connection with an administrative proceeding under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq. (hereinafter "IDEA").

///

///

## JURISDICTION AND VENUE

2.   This action arises under the laws of the United States.  Jurisdiction is conferred on this Court pursuant to 20 U.S.C. § 1415(i)(3) and 28 U.S.C. § 1331.

3.   Venue is proper in this court under 28 U.S.C. § 1391(b).  The defendant resides within the Central District of California and all of the events which are the subject of this complaint took place within the Central District of California.

## PARTIES

4.   Plaintiffs Manuel Banda and Lorena Banda (hereinafter "Parents") are the parents of Jose Banda (hereinafter "Student"), who is a student with disabilities within the meaning of IDEA.

5.   Defendant Antelope Valley Union High School District (hereinafter "District") is a public entity organized and existing under the laws of the State of California.  Pursuant to the Constitution and laws of the State of California, defendant District has a duty to provide a free public school education to all children residing within its jurisdictional boundaries.  Pursuant to IDEA, it also has the duties set forth in paragraphs 6 through 8 hereinbelow.

## STATUTORY SCHEME UNDER IDEA

6.   IDEA is the successor to the Education for All Handicapped Children Act ("EHCA"), which was adopted in 1975 to ensure that children with disabilities receive an appropriate public school education.  In amending IDEA in 2004, Congress found that when EHCA was enacted, the educational needs of literally "millions" of children with disabilities were not being met because "they did not receive appropriate educational services" or "were excluded entirely from the public school system and from being educated with their peers." 20 U.S.C. § 1400(c)(2)(A) and (B).  Although it found that progress had been made, Congress further found that the implementation of IDEA "has been impeded by low expectations, and an insufficient focus on applying replicable research on proven methods of teaching and learning for children with disabilities." 20 U.S.C. § 1400(c)(3) and (4).  Congress also found IDEA that the education of disabled

1  children can be more effective by providing for "appropriate special education and related

2  services, and aids and supports in the regular classroom to such children whenever

3  appropriate." 20 U.S.C. §1400(c)(5)(D).  Congress therefore re-enacted IDEA in order,

4  among other things, "to ensure that all children with disabilities have available to them a

5  free appropriate public education that emphasizes special education and related services

6  designed to meet their unique needs and to prepare them for employment and independent

7  living" and "to ensure that the rights of children with disabilities and their parents are

8  protected."   20 U.S.C. § 1400(d)(1)(A) and (B).

9          7.      Defendant District has responsibility for providing the free and appropriate

10  education required by IDEA to eligible students residing within its boundaries.

11  Defendant District is the "local educational agency" within the meaning of 20 U.S.C.

12  § 1401(19).

13          8.      Pursuant to 20 U.S.C. § 1415(b)(6)(A), "[a]ny party" may present a

14  complaint with respect to any matter relating to the identification, evaluation, or

15  educational placement of [a] child, or the provision of a free appropriate education to

16  such child," and have the complaint resolved in an impartial due process hearing.  At all

17  times relevant hereto, California had established an impartial due process hearing system

18  with hearings conducted by the California Office of Administrative Hearings ("OAH").

19          9.      20 U.S.C. § 1415(i)(3)(B) provides that in an action or proceeding brought

20  under Section 1415, the court may in its discretion award reasonable attorneys' fees as

21  part of the costs to the parents of a child with a disability who is the prevailing party.

22                                 **CLAIM FOR RELIEF**

23          10.     On May 14, 2012, Plaintiffs filed a complaint for due process and requested

24  an administrative hearing in accordance with the procedures authorized by 20 U.S.C. §

25  1415(b)(6)(A) and in accordance with the procedures of OAH to determine whether

26  Defendant had procedurally and substantively violated the IDEA resulting in a denial of a

27  free and appropriate public education ("FAPE") to Student during the applicable statutory

28  period.

11.    On September 12, 2012, District filed its own complaint for due process and requested an administrative hearing in accordance with the procedures authorized by 20 U.S.C. § 1415(b)(6)(A) and in accordance with the procedures of OAH to determine whether the District's March 5, 2012 triennial psychoeducational assessment of Student was appropriately conducted pursuant to IDEA, and if not, whether Student was entitled to an independent educational evaluation at public expense pursuant to 20 U.S.C. § 1415(b)(1) and (d)(2)(A); 34 C.F.R. §300.502(b).

12.    Both cases were consolidated and OAH conducted a hearing on December 3, 5, 6, 10, 11 and 12, 2012 in Lancaster, California.  OAH issued its decision on February 11, 2013, and a copy is attached hereto as Exhibit A.  Plaintiffs were the prevailing parties with regard to their complaint as well as the complaint filed by the District.

13.    Plaintiffs had retained the law firm of Law Offices of Henry Tovmassian to represent their interests in connection with the consolidated due process proceedings. Attorneys Henry Tovmassian and George D. Crook represented Plaintiffs in connection with the consolidated due process proceedings.

14.    Because Plaintiffs were the prevailing parties in the consolidated due process proceedings, Plaintiffs are entitled to their reasonable attorneys' fees and expenses in connection therewith.  The amount of said fees and expenses are not less than $230,000.00, to the recovery of which Plaintiffs are entitled together with interest thereon as provided by law.

## ATTORNEYS' FEES AND EXPENSES

15.    Plaintiffs are also entitled to their reasonable attorneys' fees in connection with bringing this action pursuant to 20 U.S.C. § 1415.  As of this writing, the amount thereof is undetermined.

## REQUEST FOR RELIEF

Plaintiffs respectfully request the following relief:

1.      Reasonable attorneys' fees and expenses incurred in the administrative proceeding in the total amount of not less than $230,000.00.

2.      For interest thereon as provided by law.

3.      For costs, disbursements, and reasonable attorneys' fees in bringing and prosecuting this action.

4.      For such other relief as may be just and proper.

DATED: May 9, 2013                          LAW OFFICES OF HENRY TOVMASSIAN

                                            Henry           Digitally signed by Henry Tovmassian
                                                            DN: cn=Henry Tovmassian, o=Law
                                                            Offices of Henry Tovmassian, ou,
                                            Tovmassian      email=tovmassian@att.net, c=US
                                     By                     Date: 2013.05.09 18:29:32 -07'00'
                                            HENRY TOVMASSIAN
                                            Attorneys for Plaintiffs

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
STATE OF CALIFORNIA

| | |
|---|---|
| In the Consolidated Matters of:<br><br>PARENT ON BEHALF OF STUDENT,<br><br>v.<br><br>ANTELOPE VALLEY UNION HIGH SCHOOL DISTRICT, | OAH CASE NO. 2012050676 |
| ANTELOPE VALLEY UNION HIGH SCHOOL DISTRICT,<br><br>v.<br><br>PARENT ON BEHALF OF STUDENT. | OAH CASE NO. 2012090331 |

## DECISION

Administrative Law Judge (ALJ) Adrienne L. Krikorian, Office of Administrative Hearings (OAH), State of California, heard this consolidated matter on December 3, 5, 6, 10, 11 and 12, 2012 in Lancaster, California.

Attorney Henry Tovmassian represented Student. Attorney George Crook and Educational Advocate Ed Brostoff (Mr. Brostoff) attended most days of hearing. Mr. Brostoff testified. Student's father (Father), who was assisted at all time by a Spanish language translator, attended all days of hearing except for a few afternoons and testified. Student attended the last afternoon of hearing and testified. Attorney Bridget Cook represented Antelope Valley Union High School District (District). Special Education Director Johan Mekel (Mr. Mekel) was also present on all days of hearing and testified on District's behalf.

On May 14, 2012, Student filed a request for due process hearing. OAH granted a continuance for good cause on June 21, 2012. On September 12, 2012, District filed a request for due process. On October 3, 2012, OAH granted the parties' joint motion to consolidate both matters, and vacated the dates in District's case. At the hearing, the ALJ received sworn testimony and documentary evidence. At the request of the parties, the ALJ further continued the hearing to January 7, 2012 to allow the parties time to file closing briefs. On December 30, 2012, the parties jointly filed a request for additional briefing time.

EXHIBIT "A"

The undersigned ALJ granted a further continuance to January 10, 2013 for closing briefs. The parties timely submitted their closing briefs and the record was closed on January 10, 2013.

ISSUES[1]

<u>District's Issue</u>

1.      Was District's March 5, 2012, triennial psychoeducational assessment appropriately conducted, such that Student is not entitled to an independent educational evaluation at public expense?

<u>Student's Issues</u>

2.      Did District procedurally and substantively violate the Individuals with Disabilities Education Act (IDEA) resulting in a denial of a free appropriate public education (FAPE) during the applicable statutory period, by failing to:
    a. appropriately assess Student in all areas of suspected disability including
        1) intellectual functioning; attention/concentration/executive functioning; informational processing including language processing, development and use and visual/perceptual skills; memory functioning, including verbal memory and non-verbal memory; gross and fine motor functioning, sensory integration, social/emotional functioning, and transition needs; occupational therapy (OT); auditory and visual processing, secondary transition; and
        2) academic functioning and language and communication;
    b. identify present levels of performance (PLOPS) and develop appropriate measurable goals;
    c. offer and provide appropriate
        1) placement;
        2) accommodations and services; and
    d. offer appropriate extended school year (ESY) services?

FACTUAL FINDINGS

1.      Student, whose birthday is in January, was 17 years and 11 months old at the time of hearing and lived with his parents within District boundaries.  He attended the 12th grade at District's Palmdale High School (Palmdale).  He speaks Spanish and English

---

[1]      The issues as articulated in the PHC order issued by OAH on October 9, 2012, were revised and restated for purposes of clarity and organization of this Decision with the mutual agreement of the parties on the first day of the hearing.

2

EXHIBIT "A"

fluently.  Student is eligible for special education under the category of other health impaired (OHI) due to attention related disorders.

*February 11, 2009 Initial Pyschoeducational Assessment*

2.      Student was first found eligible for special education during his last year of middle school in the 2008-2009 school year.  He was evaluated at the request of Father, who was concerned that Student increasingly struggled with academics, particularly in math and reading as those subjects became more complicated.  School psychologist intern Michelle Davis conducted a psychoeducational assessment, the results of which were summarized in a report dated February 11, 2009.  Student's overall general learning ability fell within low average range.  Student's "continued weakness" in vocabulary, as well as lack of work production, appeared to be the primary focus of Student's academic difficulties.  However, the assessor concluded that, because he did not exhibit a severe discrepancy between his assessed ability and academic achievement, Student did not meet the eligibility criteria of an individual with exceptional needs as a student with a specific learning disability (SLD).  He was, however, found eligible under the category of OHI due to symptoms resembling attention disorder.  An individualized education program (IEP) was developed for Student on March 9, 2009.

*March 30, 2010 IEP*

3.      At the beginning of the 2009-2010 school year, Student enrolled in the tenth grade at Palmdale.  District held an annual IEP meeting on March 30, 2010.  District did not assess Student prior to the IEP meeting.  Father expressed his concern to the IEP team that Student did not finish all of his assignments, and that Student may require designated instructional services (DIS) in counseling regarding his difficulty in academics.  The IEP team reviewed Student's scores on the California Standards Test (CST), which were below basic in English/Language Arts (ELA) and math.  On District Benchmark Exams (DBE) Student scored proficient in ELA and Algebra during the second quarter of the school year.  The IEP team reported that PLOPs in the areas of communication development, gross/fine motor, social emotional/behavioral, vocational, and adaptive/daily living skills were not applicable.

4.      Student's March 30, 2010 IEP specified placement in general education classes except for specialized academic instruction (SAI) in a study skills class 55 minutes five times weekly for a total of 275 minutes a week.  District did not offer ESY.  The IEP team recommended that Student take the California Modified Achievement Test (CMA) in ELA with testing accommodations including extra time and a small group setting.  The CMA has fewer questions and options for answers, and is often administered to students with attention disorders.  The IEP team also provided for instructional accommodations which included books on tape; preferential seating; use of assignment notebook planner; cues/prompts/reminders of rules; repeated and rephrased instructions and rules; check for understanding; extended time to complete assignments; and small group setting, extra time and on task reminders, and verbal and visual encouragement during testing.  The IEP team

3

EXHIBIT "A"

developed four annual goals in employment and education, writing, vocational skills addressing assignment completion, and Algebra. Student remained on track to graduate in May 2013. Although the IEP team agreed that it would explore DIS counseling as a related service, District did not follow up after the IEP meeting.

5.     Student ended the 2009-2010 school year with a "D" in Algebra 1, Healthful Living, and English 9, and an "F" in Physical Education 1 (P.E. 1) and Biology. He made up biology during the summer by taking Life Science with a passing grade. His first semester grade average was 1.333 and his second semester grade average was 0.8333.

*February 10, 2011 IEP*

6.     District held an annual IEP meeting on February 10, 2011. District did not assess Student prior to the IEP meeting.

7.     The IEP team included Student's parents (Parents), a Spanish language translator, educational advocate Mr. Brostoff, local educational area (LEA) representative Dawn Voegel, general education teacher Jerry Concha, special education teacher Charae Anderson (Ms. Anderson), and guidance counselor Julie Cassady (Ms. Cassady).

8.     Ms. Cassady has a bachelor's degree in psychology and a master's degree in school counseling. She has a California Pupil Personnel Services credential and, since the 2010-2011 school year, has been Student's guidance counselor. She testified at the hearing.

9.     Ms. Anderson has a master's degree in special education and holds several California teaching credentials. She has worked for District since 2008 as a special education teacher, resource teacher, special education department chair, and, since 2011, as a teacher on special assignment for IEP compliance. Ms. Anderson was Student's case manager and resource teacher for the 2010-2011 school year. She prepared the draft IEP for the meeting. She relied upon Student's prior records, including test scores, and collaboration with his teachers, and she facilitated the meeting. She testified at the hearing.

10.    The IEP team reviewed Student's Individual Transition Plan (ITP) which including Student's goals of attending a two year college with a transfer to a four year college, of earning a degree and becoming an architect, and living independently after graduation.

11.    Educational advocate Mr. Brostoff expressed Father's concerns that Student was then earning a "D" in World History due to missing assignments, and that he was behind 10 credits toward graduation because of failed classes.

12.    The IEP team reviewed Student's PLOPs, including fall 2010 scores on the CST, which placed Student at basic in ELA, and below basic in math and in science. On the October 2010 DBE Student scored below basic in geometry and ELA. On the December 2010 DBE Student scored below basic in world history and geometry, and proficient in ELA

4

EXHIBIT "A"

and earth science. He received a grade of "F" on his January 25, 2011 World History quiz, and a grade of "D" on his Earth Science Chapter 11 quiz. The IEP team reported that Student read, understood and connected essential ideas at approximately a ninth grade level. The IEP team reported that Student's communication development, gross and fine motor skills, and social emotional/behavioral were "age appropriate" and that no concerns existed. The IEP team did not report on "Adaptive/Daily Living Skills," noting that they were "not applicable."

13.     The IEP team reviewed Student's 2010 IEP goals. In vocational skills, Student was expected to complete 90 percent of assignments in all classes by March 2011. Student made some progress but did not work at his capacity, and by December 2010 he was completing 70 percent of his assignments. In Algebra, Student was expected to add, subtract, multiply and divide monomials and polynomials with 80 percent accuracy in 10 trials. By December 2010, Student had made some progress, but reflected poor work habits, and completed five of nine trials with 70 percent accuracy. The IEP team did not have Student's March 2010 IEP goals three and four and, with educational advocate Mr. Brostoff's permission, did not discuss those goals in detail. The IEP team developed four new annual goals for Student.[2] Goal number one was in math calculation; number two was in writing/transition; number three was in study skills; and number four was in science. Each goal contained three progressive objectives.

14.     Ms. Anderson was concerned that Student's grades were below basic in math and ELA. She recommended as an accommodation that Student move to the front of the classroom and that Student participate in voluntary after school tutoring. District also included the following accommodations in the IEP: cues/prompts/reminders of rules; use of assignment notebook planner; repeated and rephrased instructions, checking for understanding, and extended time to complete homework as agreed upon in advance with teacher; and small group setting, extra time and on task reminders/verbal/visual encouragement during testing. Ms. Anderson did not consider or discuss with the IEP team providing one-to-one intervention or instruction in math or ELA. Although she reviewed Student's prior records, she did not recommend that the IEP team follow up on DIS counseling, as requested by Father at the March 2010 IEP.

15.     Student continued to qualify for special education services as OHI due to symptoms resembling attention disorder, which the IEP team concluded affected his ability to satisfactorily progress in general education classes.

16.     After considering and ruling out full time placement in a special day class, District offered continued placement at Palmdale, consisting of five periods of mainstreaming and one 55 minute period daily of SAI in a separate classroom for a total of

---

2     The copy of the February 2011 IEP admitted into evidence as Exhibit D2 only included annual goals one through three. However, Ms. Anderson credibly testified that the IEP developed four new goals, and a restatement of goal number four was included in the March 5, 2012 IEP, admitted as Exhibit D1, as part of the discussion of Student's PLOPs.

EXHIBIT "A"

275 minutes a week; college awareness 15 minutes once a month in a separate classroom; career awareness in a group setting 15 minutes once a month; and other transition service 15 minutes a month in a group setting. The IEP team also suggested that Student could participate in voluntary after school tutoring available to all students, supplemental instruction to retrieve credits, and Saturday school to recapture grades on missed assignments. District did not offer ESY. Father signed the IEP without objections and did not request assessments.

17.     Student attended a few of the voluntary after school tutoring sessions but did not feel that they helped him because the general education teachers assigned to the sessions did not understand his unique educational needs. He ended the school year with passing grades in all subjects.

### *February, 2012 Triennial Assessment*

18.     Father signed an assessment plan on January 31, 2012. It included evaluation areas in academic achievement, health, intellectual development, language/speech communication development, motor development, social/emotional, and post-secondary transition. District conducted a triennial psychoeducational assessment for Student in February 2012 in preparation for Student's March 5, 2012 triennial IEP meeting. The stated purpose of the assessment was to determine whether Student remained eligible under the category of OHI with attention related behavior, what his present levels of performance were in areas of cognitive abilities, academic achievement, social emotional functioning, and "other related areas;" and what factors contributed to the need for services through special education.

19.     School Psychologist Dr. Margaret Hylton (Dr. Hylton) conducted the triennial assessment, with input from Student's resource teacher Steven Prescott (Mr. Prescott), Student, and Father. Dr. Hylton testified at the hearing. Dr. Hylton is a credentialed school psychologist who has held a Ph.D. in school psychology since 1977. She has worked for the District since 2005. As part of her job duties, she conducts initial and triennial assessments, does crisis interventions for students with mental health issues, consults with teachers, parents and administrators, and works directly with students. She met Student for the first time during Student's assessment. As part of Student's assessment, Dr. Hylton administered the Kaufman Brief Intelligence Test Second Edition (KBIT2), the Behavior Assessment for Children Second Edition (BASC-II), and the Incomplete Sentences Test. She also reviewed and relied on Student's 2009 assessments, his previous IEPs, his online transcripts, his test scores including state and District testing, a report from the school nurse, and a discussion with Mr. Prescott. She demonstrated that she was qualified to administer and interpret the assessments she gave to Student and to testify about his needs based upon her findings as reported in her psychoeducational report dated March 5, 2012.

20.     On February 13, 2012, Dr. Hylton administered the KBIT2 to Student. The average range for standard scores was 85-115. Student's verbal standard score of 88 placed

him in the 21st percentile; and his nonverbal standard score of 111 placed him in the 77th percentile.  His IQ composite score of 100 placed him in the 50th percentile.

21.     On February 21, 2012, Dr. Hylton administered the BASC-II to Father, Student, and Mr. Prescott.  The responses to the three questionnaires contained no common areas related to Student's behaviors.  Father reported that Student was in the "at risk" category in the areas of attention and functional communication, he had difficulty maintaining necessary levels of attention at school, he demonstrated poor expressive and receptive communication skills and he had difficulty seeking out and finding information on his own.  Student's responses did not indicate any areas of concern.  All behavior areas were within average range.

22.     Mr. Prescott is a credentialed special education teacher with several California teaching credentials, including level two credentials as an education specialist mild/moderate, and in computer competence for teachers.  He has been a special education teacher at Palmdale since September 2000, and was Student's resource teacher in the 2011-2012 school year.  Mr. Prescott testified at the hearing and was qualified to testify about Student's levels of performance during the 2011-2012 school year based upon his experience in working with Student as his resource teacher.  Mr. Prescott reported on the BASC-II that Student was at risk in social skills, leadership, and study skills; he had difficulty complimenting others and making suggestions for improvement in a tactful and socially acceptable manner; he demonstrated weak study skills, was poorly organized, had difficulty turning in assignments on time; sometimes had difficulty making decisions; lacked creativity; and had trouble getting others to work together effectively.  Mr. Prescott did not find that attention was a significant concern for Student.

23.     Dr. Hylton also administered the Incomplete Sentences test, which required Student to write or verbalize answers to sentence starters.  The Incomplete Sentences test is not a standardized test that is based upon normative scores.  Student's responses were expansive and well written, sentences were complete and grammatically correct, and Student's mood was positive.  Dr. Hylton concluded from the results of the test that Student showed no symptoms of a reading disorder.

24.     Dr. Hylton observed Student's behavior during two testing sessions.  She did not observe him in the classroom.  Student was cooperative in all tasks.  His performance on formal testing did not appear to be adversely affected by failure or frustration, nor did Student require an excessive amount of reinforcement, praise, modification or adaptation of the standardized procedures.  She informally interviewed Student regarding his vocational goals on February 22, 2012, relying in part on his written responses to the Incomplete Sentences test which included questions about his post-secondary goals.  Student's goals for the future were realistic.  He was interested in post-secondary education in dentistry or architecture but did not have a full understanding of the nature or amount of post-secondary training careers in those areas required.

EXHIBIT "A"

25.     The District began giving the Woodcock Johnson III (WJ-III) to its students within the school year before Student's triennial assessment. Mr. Prescott received training in the administration of the assessment during the 2011-2012 school year. He administered the test for the first time in his career to Student. Although Mr. Prescott was qualified to administer the WJ-III based upon his training, he was not fully familiar with scoring the exam. Mr. Prescott administered the first 12 subtests of the WJ-III to Student. However, he did not correctly administer the delayed story recall subtest based upon the publisher's instructions because he did not put the date and time of the subtest on the test protocol, which was a requisite element for proper scoring. He reported some but not all of the scores on a Summary and Scoring Report.

26.     Dr. Hylton had interpreted the WJ-III hundreds of times and she understood how to read the scores and generally interpret their meaning. She typically did not fully record the results of all subtests in her reports. Her March 5, 2012 assessment report included some but not all of the scores from the WJ-III.[3] She reported Student's scores based on a broad picture of his performance in reading, math, written language and academic fluency. Her report did not include an analysis of all the WJ-III scores other than to note that Student's academic fluency scores were his lowest scores. She concluded that those scores indicated that Student did not perform well on timed tests and that his performance was similar to students with attention deficit hyperactivity disorder.

27.     At the time she reviewed the results of the WJ-III, Dr. Hylton noted that Student's score of 58 in reading fluency was inconsistently low when compared to Student's other WJ-III scores and his cumulative IQ. Dr. Hylton spoke with Mr. Prescott briefly regarding the WJ-III during the morning of the March 5, 2012 IEP before she finalized her report. She confirmed with Mr. Prescott that the reading fluency score was accurate before she completed her report.

28.     Although she had questions about the discrepancy in the reading fluency score and his scores on the KBIT2, she did not record her concerns in her report, discuss them with the IEP team, or follow up until the summer of 2012, after she received training on administering the WJ-III, when she discussed the score with District staff. Dr. Hylton did not consider administering any other academic achievement assessments prior to the March 5, 2012 IEP meeting to determine whether or not Student's reading fluency score of 58 was an accurate reflection of his ability or to test other discrepancies between Student's scores and his cognitive abilities.

---

[3]     Although Dr. Hylton's report made reference to an "attached summary page," the copy of her report admitted into evidence as Exhibit D12 did not include the summary page and District offered no evidence that the summary page was available to the March 5, 2012 IEP team. The Summary and Score Report of the WJ-III prepared by Mr. Prescott was admitted into evidence as Exhibit S16 and the undersigned ALJ relied in part on the data from that report, to the extent the information was not included in Dr. Hylton's report.

EXHIBIT "A"

29.     Student's 2009 score on the WJ-III in letter word identification of 110 dropped to 88 on the 2012 WJ-III. Dr. Hylton did not note the change in scores in her assessment report, nor did her report reflect any recommendations to help Student improve in letter word identification, given the drop in scores.

30.     District special education teacher on assignment Sherri Davis (Ms. Davis) rescored Student's WJ-III in the early fall of 2012, using the protocols from Student's February 2012 assessment. Ms. Davis has a master of arts in education, supervision and administration, and multiple teaching credentials including in special education. Her work experience includes serving as a special education teacher, conducting assessments, and writing IEPs. Ms. Davis testified at the hearing.[4] She discovered that Mr. Prescott had erroneously scored the reading fluency subtest. Based upon Ms. Davis's rescoring, Student's revised score in reading fluency was 87, which placed him within the standard deviation on that subtest. In written expression, Student's original score was 103 and rescored was 82. Student's original score on writing samples was 126 and rescored was 91. Additionally, Mr. Prescott's scoring report and Ms. Davis' scoring report reflected other inconsistencies, where some scores were reported on Mr. Prescott's report but not on Ms. Davis' report, and vice versa. Ms. Davis could not rescore the story recall subtest because Mr. Prescott did not include required information on the test protocol, as discussed above. In both Ms. Davis's and Mr. Prescott's opinions, varied scoring on some subtests could have been the result of subjective grading by the grader. As a result of the rescoring, Dr. Hylton issued an addendum to her psychoeducational report in the fall of 2012.

31.     As part of Dr. Hylton's interview of Mr. Prescott on March 5, 2012, he reported that Student met all previous goals except his writing goal. At the time of the assessment, Student's grade in Algebra 2 was an "F." He had not passed the math section of that year's California High School Exit Exam (CAHSEE), and he had 130 credits toward 230 needed for graduation. He had three disciplinary notes in his records, two for multiple tardiness and one for defiance in a classroom.

32.     Dr. Hylton did not assess Student in the areas of gross/fine motor development or language/speech communication because, upon her review of Student's records, in her opinion Student had never historically exhibited needs in those areas. If Student had limited language abilities she would have referred him for a speech and language (SL) assessment.

33.     Dr. Hylton concluded that Student remained qualified for special education with a primary designation of OHI due to his attention deficits. In her opinion, whether or not Student had a SLD was not an area of concern because he did not qualify for SLD eligibility in his 2009 assessment. Dr. Hylton concluded that his attention deficits affected his ability to remain on task and his ability to plan and organize his work. She recommended that he may need assistance with organization and planning, finding papers and placing them

---

[4]     Ms. Davis' Summary and Score Report was admitted into evidence as Exhibit S17 and the ALJ considered it to the extent that it was relevant to the issue of the reliability of the test scores at the time of the March 5, 2012 IEP meeting.

EXHIBIT "A"

in the correct folders, and turning in completed work.  She also concluded he would benefit from redirection, and guided notes to help him remain on task.

### March 5, 2012 IEP

34.     District held an IEP team meeting on March 5, 2012.  Father, the family's educational advocate Mr. Brostoff, Student, a Spanish language translator, Dr. Hylton, a general education teacher, Mr. Prescott, and Ms. Cassady attended.  Mr. Prescott prepared a draft IEP prior to the meeting and facilitated the IEP meeting.

35.     The IEP team discussed Student's attendance record, which included 10 incidents of tardiness up to the time of the meeting.  Student's general education teacher reported that Student was occasionally off task.  The IEP team discussed ways in which Student could make up missing credits, including supplemental instruction and summer school.  The IEP team discussed District's optional tutoring program and provided Student with a schedule of tutoring hours.

36.     The IEP team discussed Student's PLOPS, including test scores.  At the time of the meeting, Student had passing grades in all subjects except Algebra 2, where his grade was an "F;" he failed his first semester of English 11.  Student performed far below basic in math and science on the CST, and basic in ELA and history/social sciences.  Mr. Prescott reviewed some of Student's scores on the WJ-III, although the IEP notes did not reflect that he shared the summary score sheet with the IEP team or discussed all scores, including the reading fluency score of 58.  He reported, and recorded in the IEP, that Student had a standard broad score of 80 in reading, which was 20 points below average.  His standard score in broad math of 81 was 19 points below average.  His standard broad score of 108 in written language was eight points higher than average.  Student did not pass the math portion of the CAHSEE in March 2011.  He received a score of 42 percent in Algebra 1, and 28 percent in measurement and geometry, where a score of 55 percent was passing.  Student retook the math portion of the CAHSEE in November of 2011 and again did not pass, with an 8 percent in Algebra 1 and a score of 56 percent in measurement and geometry.  During the 2011-2012 school year, Student scored proficient in ELA in the first quarter and below basic in the second quarter.  In Algebra 1 he scored far below basic in the first quarter and below basic in the second quarter.  In biology, he scored basic in the first quarter and below basic in the second quarter.

37.     In academics, Student continued to read, understand and connect essential ideas at approximately the ninth grade level.  In communication development, gross/fine motor development, vocational, and adaptive living skills, Student's performance was recorded as age appropriate and no concerns existed.  In the area of social/emotional, Student had difficulty maintaining attention and remaining on task, he had problems with organizational and planning skills, and some difficulty with social skills.  He was generally polite and respectful but required assistance to meet deadlines for completing and turning in classwork.

EXHIBIT "A"

38.    Mr. Prescott reviewed Student's progress on his four annual goals.  In Mr. Prescott's opinion, Student was making sufficient progress to meet his annual goals in math and science.  However, Mr. Prescott did not analyze with specificity whether Student had met the second and third short-term objectives of the math and science goals, or the goals as written, and he did not correlate Student's failing grade in Algebra 2 to the goals.  Student did not meet his writing/transition goal.

39.    The IEP team developed four new goals for Student, in reading/transition, writing/transition, Algebra 2/transition, and study skills/transition.  Each goal included three short-term objectives and the language of the goal was based upon state standards for Student's grade level.

40.    Mr. Brostoff expressed Father's concern that Student was not passing Algebra 2.  Father did not request additional assessments.  Ms. Cassady discussed Student's status towards graduation, his deficiency in credits, and ways that he could recapture those credits.  She did not review prior IEPs in preparation for the IEP meeting and was not aware that Father had previously requested that the District consider counseling as a special education related service for Student.

41.    The IEP team considered whether Student would benefit from placement full-time in a special day class and concluded that the least restrictive environment (LRE) for Student continued to be a general education setting with one period of resource support.  District offered Student continued placement at Palmdale in a general education classroom five periods a day; SAI 22 minutes five times a week for a total of 110 minutes in a separate RSP class; college awareness in a group setting 55 minutes a week in the RSP class; career awareness in a group setting 55 minutes weekly in the RSP class; other transition service in a group setting 55 minutes a week in the RSP class.  District also offered instructional accommodations and modifications including guided notes for all lecture classes; access to computer on campus; preferential seating; short breaks between assignments; cues/prompts/reminders and redirection to remain on task; use of multi-modal approach to explain new concepts; home school communication via internet; strategies during instruction including rephrased and repeated instructions, checking for understanding and extended time to complete assignments as agreed upon in advance with the teacher; and, during testing, a small group setting and extra time as needed.  The IEP was translated into Spanish for Parents and Father signed his consent to the IEP.

42.    From the time Student enrolled at Palmdale, Father and Student were concerned that District did not provide Student with enough individualized academic instruction to help him overcome his difficulties with his academic classes, particularly in math and reading.  Student perceived himself as a visual learner.  He struggled in math during the first semester of the 2010-2011 school year because the teacher did not take the time to explain math problems to him more than once.  He requested a change in math teachers and District agreed to do so.  During the second semester of that school year, the new math teacher took more time to clearly explain the math problems for Student, which Student found helpful.  Student felt that his general education teachers did not have enough

11

time or the understanding of his individual needs to work with him individually to help him when he struggled. Student was sometimes too proud to ask for individual help, even from Mr. Prescott, because he did not want to draw attention to himself.

43.     In the September 2012, after Student filed his due process complaint, Student's attorney requested that District conduct several independent educational evaluations (IEE), including in the areas of psychoeducational and SL. Student requested that neuropsychologist Dr. Timothy Gunn (Dr. Gunn) conduct the pyschoeducational IEE and that Lisa Sandoval (Ms. Sandloval) conduct the SL IEE. District and Father subsequently agreed that District would conduct a SL assessment, which was not completed at the time of the hearing.

*Expert Opinions*

A.     *School Psychologist Dr. Margaret Hylton*

44.     Dr. Hylton defended the results of her testing and evaluation procedures, opining that they appeared to be valid for the purpose of addressing the reason for the referral for assessment. In her opinion, her reliance on Student's composite IQ score in combination with Student's attention difficulties resulted in a more accurate reflection of Student's cognitive abilities than considering the significance of each of the individual KBIT2 scores in verbal and non-verbal reasoning. Also in her opinion, Student's reading scores did not indicate that he had a SLD in reading nor did she find discrepancies between Student's test scores significant, in particular because some of the tests administered were timed tests. Although Student's score in the broad reading cluster test was -1.52 below the standard deviation, and his score in broad math was -1.12 below the standard deviation, in Dr. Hylton's opinion Student did not qualify for a SLD in reading or math. Nothing in Student's academic history led Dr. Hylton to suspect that Student had a SLD in reading. As such, she attributed his low reading scores to his attention issues.

45.     In Dr. Hylton's opinion, determining whether Student had a SLD in math required more than just looking at the math calculation subtest of WJ-III, where Student's score was 23 points lower than his combined IQ of 100. She relied on all of his scores in the math, calculation, applied problems, and math fluency subtests, how he previously tested on those subtests, and his history of performance in math, including attention issues. In her opinion, math calculation was an area Student resisted, which was consistent with his attention issues. However, she could not state for certain that Student did not have difficulty answering the math questions during the WJ-III nor did she credibly explain how the fact that he was then failing Algebra 2 factored into her analysis. Even though his 2012 score on the calculation subtest declined from his 2009 score, in her opinion the 2012 score may have been related to attention issues, although she could not say for certain. However, Dr. Hylton acknowledged at the hearing that Student's score on the math calculation subtest gave her a reason to suspect that Student may have a SLD in math, even though she did not raise the issue in her report or at the IEP meeting.

12

EXHIBIT "A"

46.     Dr. Hylton also opined that, although the WJ-III was rescored several months after her assessment of Student, the rescoring did not invalidate her assessment because she based her conclusions in her report on more than one test in conjunction with records reviews, observations and interviews.  In her opinion, under the Diagnostic and Statistic Manual Fourth Edition (DSM IV), which is used to diagnose mental health disorders, Student did not meet the criteria for a SLD.  District utilizes DSM IV diagnoses for reading, math and written expression disorders in conjunction with other testing.  Dr. Hylton ultimately concluded that Student's academic struggles were attributable to his persistent attention issues.

B.     *Neuropsychologist Dr. Timothy Gunn*

47.     Dr. Gunn testified on Student's behalf.  Dr. Gunn received his doctor of philosophy in clinical psychology in 2008.  He holds a masters degree in clinical psychology and is a California licensed clinical psychologist.  He works in his own private practice, and serves as a pediatric neuropsychology consultant, executive assessment director and senior assessment consultant for third party organizations.  Dr. Gunn's resume is extensive in the area of academia.  His training as a neuropsychologist qualified him to assess language-based difficulties because language is a brain-based function, which falls within his areas of expertise.  He has no training or work experience as a school psychologist.  Dr. Gunn conducted an independent educational assessment of Student in late October and early November 2012.  Dr. Gunn's assessment included an extensive battery of standardized diagnostic tests including the BASC-II; California Verbal Learning test, Second Edition; Comprehensive Test of Phonological Processing; Delis-Kaplan Executive Function System, Expressive One-Word Picture Vocabulary Test, Wechsler Adult Intelligence Scale, Fourth Edition; Wechsler Memory Scale, Fourth Edition; and the WJ-III.  He also reviewed Student's past educational records, all of his prior IEPs, the 2009 and 2012 psychoeducational assessments, and a SL independent assessment administered by Ms. Sandoval in September 2012.  He did not interview anyone from District or any of Student's teachers.  He documented his assessments, recommendations and conclusions in a written report dated November 18, 2012.[5]  Dr. Gunn demonstrated that he was qualified to offer opinions relating to Student's academic needs at the time of the February 2011 and March 2012 IEPs, and the appropriateness of District's March 5, 2012 triennial assessment.

_____

[5]     Dr. Gunn's report was admitted into evidence and considered by the ALJ.  However, his assessment results and conclusions were given little weight under *Adams v. State of Oregon* (9th Cir. 1999) 195 F.3d 1141, 1149, because the results of the report were not provided to District until after the March 5, 2012 IEP meeting and shortly before the due process hearing.  The ALJ considered Dr. Gunn's report to the extent that it provided the basis for Dr. Gunn's opinions of Student's academic needs that were or should have been known to the IEP team at the time of the IEP meetings, his opinions relating to District's triennial assessment, and his opinions on remedies.

EXHIBIT "A"

48.    Generally, Dr. Gunn criticized Dr. Hylton's report, characterizing it as incomplete because she did not report all of Student's scores on the WJ-III administered by Mr. Prescott. For example, although Dr. Hylton concluded that Student had average IQ of 100, his standard score in calculation on Mr. Prescott's WJ-III was 75, which was a 25-point deviation from his IQ score, and more than a -1.5 deviation from the standard score, which she should have reported. Additionally, Dr. Hylton should have reported Student's broad math score of 81 in her report, which was a 19-point deviation from his IQ and close to the -1.5 standard deviation of 22 points, which would suggest an SLD. Similarly, she should have reported Student's low reading fluency score and scores from other reading subtests.

49.    Dr. Gunn disagreed with Dr. Hylton's conclusion that Student did not have a SLD in reading or math. To determine whether a Student has a SLD, the Student must demonstrate a significant discrepancy between his intellectual functioning and academic achievement, as measured by valid test measures.

50.    In Dr. Gunn's opinion, Student met the criteria for a SLD in reading and math and for a language disorder, both at the time of Dr. Gunn's assessment and at the time of the March 5, 2012 IEP. Dr. Hylton had enough information before her at the time of her assessment to further investigate whether Student had a SLD in math, for example by administering additional academic tests that were available. Student's scores on the math subtests of the WJ-III combined with Student's academic history should have been indicators to Dr. Hylton that Student had a SLD in math. Specifically, Student failed the math section of the CAHSEE twice before Dr. Hylton's assessment and he historically struggled in math classes. Similarly, Student's math calculations subtest and brief math scores were relatively low, and, at the time of Dr. Hylton's assessment, Student had an "F" in Algebra. Dr. Gunn disagreed with Dr. Hylton's conclusion that attention disorders impacted Student's math skills because he saw very little evidence in the records that were available to Dr. Hylton that attention had a significant impact on Student's performance in math.

51.    Dr. Gunn also opined that Dr. Hylton had enough information from Student's WJ-III scores and his past records of performance to find that Student had a SLD in reading. Specifically, Student scored below basic in ELA on the CST in the 2009-2010 school year. Student's reported reading fluency score on the 2012 WJ-III was 58, which Dr. Hylton did not include in her report, and which should have caused Dr. Hylton concern that Student had a reading disorder. Student's broad reading score of 80 was 20 points below his composite IQ of 100. His letter word identification score of 80 was 20 points below his composite IQ. His scores in the areas of word analysis and vocabulary development indicated that deficits in those skills were affecting his language skills.

52.    Dr. Gunn opined that Student also demonstrated deficits in language. Student's story recall score of 77 on the WJ-III, which Dr. Hylton did not record in her report, was 23 points below, and more than a -1.5 standard deviation from his composite IQ. Student's lower score in the story recall subtest suggested deficits in expressive and receptive language and indicated a possible SLD in oral expression. Mr. Prescott did not give any of

14

EXHIBIT "A"

the supplemental subtests on the WJ-III, which, if they had been given, would have also tested oral expression.

53.     Dr. Gunn had numerous other criticisms of the March 5, 2012 assessment and report. The report contained very little evidence that Student was assessed in the area of attention. Dr. Hylton reported that she interviewed only one teacher, Mr. Prescott, on the same date as her report was completed, which raised the question of whether it was a thorough interview. On the BASC-II, she only asked Mr. Prescott to respond. Given Student's difficulty in math and reading, Dr. Hylton should have interviewed his math and English teachers, at a minimum. Dr. Hylton did not observe Student in any of his classroom settings, which, in Dr. Gunn's opinion, was required to determine eligibility, a focus of the triennial assessment. Dr. Hylton did not assess auditory processing or visual processing, both of which were noted as areas of concern by the 2009 assessment. She did not re-assess visual motor integration, even though it was listed on the assessment plan. Dr. Hylton did not include in her interpretation section of her report a discussion of Student's low scores, as discussed above, on the WJ-III. In particular, she should have addressed Student's low scores in math calculation, given his history of difficulties in math. In Dr. Gunn's opinion, not interpreting or noting Student's low reading fluency score was an egregious error by Dr. Hylton.

54.     Dr. Gunn criticized Dr. Hylton's use of the KBIT2, which in his opinion is not comprehensive and is often used for Spanish speaking students, which was not indicated in Student's case. The KBIT2 is typically used when a child has long standing IQ issues, which was also not applicable to Student. A more comprehensive screening would have shown more subtle factors. Because this was Student's triennial assessment, Dr. Gunn expected that Dr. Hylton would have used a more comprehensive approach to the assessment. Dr. Gunn was also critical of Dr. Hylton's reliance on Student's combined IQ, which he felt was inappropriate. A more accurate representation would have been to report that Student did well in non-verbal reasoning, but had difficulty with verbal reasoning, the latter of which was indicative of a language disorder.

55.     Dr. Gunn was also critical that Dr. Hylton did not interview Parents except for giving Father the BASC-II questionnaire. A standard technique in assessments is to interview at least one parent, in addition to administering the BASC-II, which would provide a qualitative evaluation based upon a non-school environment. In Dr. Gunn's opinion, doing so would have helped Dr. Hylton see whether Student's deficits existed in two different settings. Dr. Hylton also should have asked parents to explain their reported concerns on the BASC-II in the areas of expressive and receptive language.

56.     Dr. Gunn criticized the Incomplete Sentences test administered by Dr. Hylton, which in his opinion is a projective test to measure social emotional issues and is not a validated assessment for reading disorders, as used by Dr. Hylton. The test involves very little reading and should not have been used by Dr. Hylton to rule out a reading disorder.

15

EXHIBIT "A"

57.     Dr. Gunn recommended that, because Student was in his last year of high school on track to graduation, in order to recapture lost instruction in math and language/reading, Student would benefit from 200 hours of educational therapy. He also recommended that Student's educational program should include more resource time including two hours of educational therapy a week in math and reading.  Dr. Gunn charged Father $4,800 for his independent assessment.

C.     *Speech Therapist Lisa Sandoval*

58.     Ms. Sandoval has a bachelor of arts in speech and hearing science and a master of science in communicative disorders and has worked as a speech pathologist since 1989.  She holds a California license as a speech-language pathologist, a certificate of clinical competence from the American Speech-Language Hearing Association, an Assistive Technology Applications Certificate, and a Level 1 certificate in the Wilson Reading Program.  Her resume includes teaching and research experience in the field of speech-language.  Ms. Sandoval assessed Student in September 2012 to determine whether he had a language disorder.  Her assessment consisted of standardized testing, including the Peabody Picture Vocabulary Test-4; Expressive Vocabulary Test 2; Test of Written Language 4; Clinical Evaluation of Fundamental Language; Gray Oral Reading test; language and reading samples; Wilson Assessment of Decoding and Encoding; and Northwestern University Intelligibility Test.  She reviewed Student's educational and medical history and interviewed Father, who reported that Student continued to struggle with attention, written expression, listening, memory and auditory comprehension.  Ms. Sandoval observed Student during testing and did not find that attention issues affected her testing.  She did not talk to any of Student's teachers or observe Student in the classroom in preparation for her assessment. She documented her assessments, recommendations and conclusions in a written report dated September 18, 2012, and a supplement dated November 30, 2012.[6]  Ms. Sandoval based her opinions on her own assessments, and her review of Student's records, test scores, past IEPs, and past assessments.  Ms. Sandoval demonstrated that she was qualified to offer opinions relating to Student's unique needs in the area of SL.

59.     In Ms. Sandoval's opinion, Student had a significant and historic deficit in expressive and receptive language.  Specifically, Ms. Sandoval concluded that Student demonstrated a disorder in the area of semantics/vocabulary; receptive language/auditory comprehension; oral reading skills; and auditory memory/word associations.  In her opinion, those areas of weakness adversely affected his ability to effectively comprehend information

---

[6]     Ms. Sandoval's report was admitted into evidence and considered by the ALJ. However, her assessment results and conclusions were given little weight under *Adams v. State of Oregon, supra,* 195 F.3d at p.1149, because the results of the report were not provided to District until after the March 5, 2012 IEP meeting and shortly before the due process hearing.  The ALJ considered her report to the extent that it related to her review of records and assessments available to the March 5, 2012 IEP team, her opinions of Student's academic needs that were or should have been known to the IEP team at the time of the IEP meetings held by District, and her opinions on remedies.

EXHIBIT "A"

in the classroom and effectively communicate. Student exhibited a lack of understanding of rules in phonological awareness, and exhibited moderate weakness in spelling and reading skills, which negatively affected his progress in language arts and reading skills. Student's difficulties in SL skills negatively affected his ability to engage in and maintain reciprocal communicative interactions, ask questions to gain/clarify information, give oral reports, and participate in group discussions. Student's scores on Ms. Sandoval's assessments revealed areas that fell below the mean in semantics and phonological awareness.

60.     Ms. Sandoval recommended that Student receive direct SL services to target Student's expressive and receptive language vocabulary, teach auditory memory strategies, and the direct rules of language for phonological processing. In her opinion, Student required language intervention and direct intervention for phonological awareness, and educational therapy services to address his receptive and expressive language vocabulary skills, his auditory memory skills, and his phonological processing. Those interventions were necessary to help him acquire the ability to acquire basic fundamental building blocks of language needed for his desired career choices and his future academic schooling would be challenging for him. Based upon her findings, Ms. Sandoval recommended that Student should receive SL therapy twice a week for 60-minute sessions to address language goals, including vocabulary and auditory memory and phonological awareness; and that he begin a multisensory based reading and language program to improve his spelling, vocabulary, decoding skills, general rules of phonemic awareness, reading fluency, auditory memory and reading and comprehension skills.

61.     In Ms. Sandoval's opinion, Student exhibited similar needs at the time of the March 5, 2012 IEP, because the type of deficits she found during testing typically do not appear for the first time at Student's age. Additionally, Student's history included evidence that he had similar needs to what she found from the time he started Palmdale. For example, Student's scores during his 2009 psychoeducational assessment in the area of reading and writing were low average. He struggled with English during the 10th grade. Additionally, his scores in non-verbal and verbal ability on the 2012 KBIT2 administered by Dr. Hylton were significantly discrepant and Father reported on the BASC-II that Student had difficulty with communication skills. Those two factors by themselves should have signaled to Dr. Hylton that Student should be assessed in the area of language. Student's score of 88 on the letter word subtest of the 2012 WJ-III was significantly lower than his 2009 score of 111. In Ms. Sandoval's opinion, a variety of Student's scores on the WJ-III subtests indicated that Student might have had language issues and that Dr. Hylton should have further assessed Student's needs in that area.

62.     In Ms. Sandoval's opinion, the District's offer of resource support to help him with vocabulary was not enough. Direct intervention and collaboration with his teachers by a trained SL pathologist was required in order to address all of Student's language deficits across Student's academic program. Student must be taught the underlying skills needed to break down components of sentences before he can succeed at independent reading. In her opinion, the accommodations offered in the March 5, 2012 IEP were not sufficient to address Student's needs.

EXHIBIT "A"

63.    Ms. Sandoval charged Student $1,000 for her SL assessment.  She recommended that Student required intensive intervention in the area of SL and she recommended that, in addition to SL services on an ongoing basis, Student should receive 100 hours of compensatory language intervention from a licensed SL pathologist who has a strong background in phonological and phonemic awareness to help him recapture lost instruction in preparation for his post-secondary education.

D.    *School Psychologist Christopher Jones*

64.    Christopher Charles Jones (Mr. Jones) testified as an expert on District's behalf.  Mr. Jones has been a licensed and nationally certified educational psychologist with a masters of arts degree in school psychology since 1996.  He has worked in private practice and for California school districts as a school psychologist since 2000.  As part of his work, he performs assessments, individual counseling, classroom intervention, group counseling, behavior management, case management and training and consultation.  He is a certified behavior intervention case manager (BICM) and has a California Pupil Personnel Services Credential in School Psychology.  He did not assess Student and has never met Student, but he reviewed Student's educational transcripts, Student's 2009 and 2012 psychoeducational assessments, IEPs, Dr. Gunn's assessment, and Student's test protocols from the March 5, 2012 assessments.  Mr. Jones demonstrated that he was qualified to render opinions relating to District's March 5, 2012 psychoeducational assessment of Student and Student's March 5, 2012 IEP.

65.    In Mr. Jones' opinion, based on the referral questions in the March 5, 2012 assessment report, the tests listed by Dr. Hylton were appropriate, although Mr. Jones agreed that other tests could have been given based on Student's academic history.  The reason for referral on a triennial assessment is to establish whether the handicapping condition is still impacting the Student in the classroom, and whether his program remains appropriate.  The BASC-II was the most important assessment given by Dr. Hylton based upon Student's eligibility category of OHI due to attention deficits, and on the concerns raised by previous IEP teams.  Student's behavior observations that Dr. Hylton noted during testing were consistent with a student who had a behavior problem.  However, in Mr. Jones' opinion, an observation of Student in the classroom was required for any assessment of any disability.

66.    The KBIT2 is a cognitive assessment that looks at a student's ability to reason and process information using verbal and non-verbal reasoning skills.  A cognitive assessment is not necessarily required in a triennial assessment, where, as in Student's case, the triennial was targeting Student's behavioral issues relating to attention rather than cognitive ability.  In Mr. Jones' opinion, the discrepancy in Student's verbal and non-verbal scores on the KBIT2 was large, but he could not render an opinion as to what was the statistical significance of the discrepancy.  He noted that the March 5, 2012 IEP did not refer to the discrepancy between the scores.  He did not believe that the discrepancy was of any material consequence to Dr. Hylton's conclusion that Student continued to have attention related issues.  Student's scores in his 2009 initial assessment in verbal and non-verbal were similar to the results on the 2012 KBIT.  Perceptual reasoning scores were slightly lower on

18

EXHIBIT "A"

the initial evaluation, which Mr. Jones attributed to the possibility that the KBIT2 is not as comprehensive as the test administered in 2009.  However, the decline in Student's score in letter word identification from 111 to 88 was significant and should have raised a red flag to Dr. Hylton, because deficits in reading skills impact comprehension.

67.    In Mr. Jones' opinion, if Dr. Hylton was suspicious of Student's reading fluency score at the time of her assessment, Dr. Hylton should have corrected the report, inserted the correct score, and determined how the score impacted Student's learning profile. Similarly, Dr. Hylton should have reported Student's math calculation score in her report, discussed it with the IEP team and the IEP team should have made a decision on how to address Student's needs in math.

68.    In Mr. Jones' opinion, if the IEP team was aware that Student had a problem with reading or writing, an assessment in those areas was not necessary.  Mr. Jones believed that as long as Dr. Hylton assessed Student's skills in reading and math in the context of his IEP disability, the assessment was appropriate.

69.    In Mr. Jones' opinion, in order to find that Student had a SLD, a multidisciplinary assessment must have shown that Student had a processing deficit in a learning area and that Student struggled with that deficit in the classroom.  In Mr. Jones' opinion, Dr. Hylton's assessment did not identify any psychological processing difficulties or any factors that would have raised concerns about a SLD and, therefore, he agreed with Dr. Hylton that Student did not have a SLD in math or reading.  Similarly, Mr. Jones did not see anything in Student's records that supported Father's concern in 2010 that Student might require DIS counseling.

70.    In Mr. Jones' opinion, Student's fluency scores were consistent with those of students with attention difficulties and therefore Dr. Hylton's conclusion that reading fluency was not a specific area of concern was appropriate.  In Mr. Jones' opinion, the fact that the IEP team did not discuss Student's functional communication skills was not of concern because Father was the only person who reported it to be an area of concern on the BASC-II. Similarly, in Mr. Jones' opinion, the IEP team was not required to discuss Student's social skills because Mr. Prescott was the only person who reported on the BASC-II that Student's social skills was an area of concern.  Instead, the IEP team should have been aware of those concerns, but did not need to act on them.

71.    In Mr. Jones' opinion, Dr. Hylton appropriately interviewed Student regarding his vocational goals, and the IEP included appropriate goals to address Student's academic, vocational and attention issues.  Mr. Jones believed that basing goals on state standards is appropriate if the IEP team feels that the goal is appropriate and attainable by Student.

72.    In Mr. Jones' opinion, SL was not an area of disability because Dr. Hylton's report did not include any evidence that Student struggled with speech or language.  Dr. Hylton was not required to do any additional testing because she addressed the "handicapping condition" giving rise to eligibility, she assessed his academic performance,

19

his transition and vocational needs, she determined what was necessary to meet Student's needs and she appropriately recommended accommodations and goals for Student.

73.     Mr. Jones saw no explanation in Student's records as to why Student was reading at the ninth grade level at the time of the March 5, 2012 IEP.  In his opinion, the IEP team should have determined why Student did not advance in reading between the ninth and 11th grades.  In Mr. Jones' opinion, Dr. Hylton should have confirmed that Student's score of 58 in reading fluency was accurate before completing her report in order to rule out that Student had a SL deficit.

74.     Regarding Father's concerns about Student's expressive/receptive communication skills, in Mr. Jones' opinion, if multiple people associated with Student had expressed valid concerns in this area, then the District should have conducted a SL assessment, which would have been the only way to rule out an expressive/receptive communication deficit.

75.     Mr. Jones was critical of Dr. Gunn's assessment and in particular the fact that he did not interview any of Student's teachers or observe Student in the school setting.

## LEGAL CONCLUSIONS

1.     In an IDEA due process hearing, the party filing the request for due process has the burden of proof.  (See *Schaffer v. Weast* (2005) 546 U.S. 49, 56-62 [126 S.Ct. 528, 163 L.Ed.2d 387].)  Accordingly, District had the burden of proof on Issue 1, and Student had the burden of proof on Issue 2.

*Issue 1:  Appropriateness of District's March 5, 2012 psychoeducational assessment*

2.     In Issue 1, District contends that its March 5, 2012 psychoeducational assessment was appropriate and therefore Student is not entitled to an independent educational evaluation (IEE) at public expense.  Student disagrees, contending that the assessment was not properly conducted.

3.     At the beginning of each school year, each LEA must have an IEP in effect for each child with a disability within its jurisdiction.  (34 C.F.R. § 300.323(a) (2006)[7]; Ed. Code, § 56344(c).)  An IEP is a written document detailing, in relevant part, the student's current levels of academic and functional performance; a statement of measurable academic and functional goals; a description of the manner in which goals will be measured; a statement of the special education and related services that are to be provided to the student and the date they are to begin; an explanation of the extent to which the child will not participate with nondisabled children in a regular class or other activities; and a statement of

---

[7]     All subsequent references to the Code of Federal Regulations are to the 2006 edition.

EXHIBIT "A"

any accommodations that are necessary to measure the academic achievement and functional performance of the child on State and district-wide assessments. (20 U.S.C. § 1414(d); Ed. Code, § 56345, subd. (a).) When developing an IEP, the IEP team must consider the child's strengths, the parent's concerns, the results of recent assessments, and the academic, developmental and functional needs of the child. (Ed. Code, § 56341.1, subd. (a).)

4.     To determine the contents of an IEP, a District must assess a student eligible for special education under the IDEA in all areas related to his or her suspected disability. No single procedure may be used as the sole criterion for determining whether the student has a disability or whether the student's educational program is appropriate. (20 U.S.C. § 1414 (a)(2), (3); Ed. Code § 56320, subds. (c), (e), (f).)

5.     For purposes of evaluating a child for special education eligibility, the district must ensure that "the child is assessed in all areas of suspected disability." (20 U.S.C. § 1414(b)(3)(B); Ed. Code, § 56320, subd. (f).) The assessment must be conducted in a way that: 1) uses a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent; 2) does not use any single measure or assessment as the sole criterion for determining whether a child is a child with a disability; and 3) uses technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors. The assessments used must be: 1) selected and administered so as not to be discriminatory on a racial or cultural basis; 2) provided in a language and form most likely to yield accurate information on what the child knows and can do academically, developmentally, and functionally; 3) used for purposes for which the assessments are valid and reliable; 4) administered by trained and knowledgeable personnel; and 5) administered in accordance with any instructions provided by the producer of such assessments. (20 U.S.C. § 1414(b) & (c)(5); Ed. Code, §§ 56320, subds. (a) & (b), 56381, subd. (h).)

6.     A school district shall develop a proposed assessment plan within 15 calendar days of referral for assessment, unless the parent agrees in writing to an extension (Ed. Code §56043, subd. (a)), and shall attach a copy of the notice of parent's rights to the assessment plan (Ed. Code §56321, subd. (a)). A parent shall have at least 15 calendar days from the receipt of the proposed assessment plan to arrive at a decision whether to consent to the assessment plan. (Ed. Code §56403, subd. (b).) A school district cannot conduct an assessment until it obtains the written consent of the parent prior to the assessment (unless the school district prevails in a due process hearing relating to the assessment); assessment may begin immediately upon receipt of the consent. (Ed. Code, §56321, subd. (c).) Thereafter, a school district must develop an IEP required as a result of an assessment no later than 60 calendar days from the date of receipt of the parent's written consent to assessment, unless the parent agrees in writing to an extension. (Ed. Code, §56043, subd. (f)(1).)

7.     Individuals who are both "knowledgeable of the student's disability" and "competent to perform the assessment, as determined by the school district, county office, or special education local plan area" must conduct assessments of students' suspected

21

EXHIBIT "A"

disabilities. (Ed. Code §§ 56320, subd. (g); 56322; see 20 U.S.C. § 1414(b)(3)(B)(ii).) The determination of what tests are required is made based on information known at the time. (See *Vasheresse v. Laguna Salada Union School Dist.* (N.D. Cal. 2001) 211 F.Supp.2d 1150, 1157-1158 [assessment adequate despite not including speech/language testing where concern prompting assessment was deficit in reading skills].)

8.      A parent has the right to an IEE at public expense if the parent disagrees with an evaluation obtained by LEA, subject to the following conditions.  If a parent requests an IEE at public expense, the public agency must, without unnecessary delay, either (i) file a due process complaint to request a hearing to show that its evaluation is appropriate; or (ii) ensure that an IEE is provided at public expense, unless the agency demonstrates in an impartial hearing under the IDEA that the evaluation obtained by the parent did not meet agency criteria.  (34 C.F.R. § 300.502(a)(3)(i).)

9.      When a school district seeks to prove that it provided a FAPE to a particular student, it must also show that it complied with the procedural requirements under the IDEA. (*Board of Education of the Hendrick Hudson Central School District, et al.* v. Rowley (1982) 458 U.S. 176, 200, 203-204, 206-207 [102 S.Ct. 3034, 73 L.Ed.2d 690] (*Rowley*).)

10.      District did not meet its burden of persuasion on Issue 1.  Under the IDEA, District must assess in all areas of suspected need.  Here, District did not establish with any persuasive evidence that, when Dr. Hylton assessed Student in February and March 2012, she appropriately considered all of Student's unique needs, including whether he had needs in reading or math, or a language disorder.  Instead, the stated purpose of her assessment, as corroborated by Mr. Jones' testimony, was to verify Student's eligibility category of OHI based on attention issues and his needs related to attention issues.  Dr. Hylton's testimony in combination with Mr. Prescott's testimony established that the parameters of her assessment were narrowly focused on the referral questions listed in her report, and examining the impact of Student's attention deficits on his academic performance.  Their testimony established that neither Dr. Hylton nor Mr. Prescott seriously considered whether Student had other needs that may have been associated with a SLD or a language disorder based upon his academic struggles after he started high school in the District.

11.      Student's recorded academic history prior to the March 5, 2012 assessment, including grades and test scores, was replete with evidence that Student had long-standing academic difficulties in math, reading and language.  Those were or should have been red flags to Dr. Hylton, and to Student's IEP teams, that Student may have had a SLD or specific needs in math and reading and a language disorder related to expressive and receptive language skills that required assessment in those areas.  For example, Student ended the 2009-2010 school year with a "D" in Algebra 1, Healthful Living, and English 9, and an "F" in P.E. 1 and Biology.  Ms. Anderson was concerned during the tenth grade that Student's scores were below basic in math and ELA.  The March 2010 IEP team decided that Student would take the CMA instead of the CST in ELA because of his difficulties in English.  At the February 10, 2011 IEP meeting, the IEP team had information that Student had D grades in several classes and failed two others at the end of 10th grade.  He scored below basic in

EXHIBIT "A"

Geometry and ELA on the CST in the first semester of the 11th grade. On the December 2010 DBE, Student scored below basic in World History and Geometry, although he scored proficient in ELA and Earth Science. He received a grade of "F" in his January 25, 2011 World History quiz, and a grade of "D" on his Earth Science Chapter 11 quiz. Additionally, Father expressed concern about Student's academic struggles at each of District's IEP meetings and in his response to the BASC-II.

12.     Student's failing grades in Algebra 2 and first semester English 11, in combination with his 2012 WJ-III scores, should have caused Dr. Hylton to consider using additional assessment tools to determine whether Student had a SLD in reading or math. In fact, Dr. Hylton admitted at hearing that certain red flags from Student's 2012 WJ-III scores existed that suggested Student may have had a SLD or associated needs in reading and math. Finally, Dr. Hylton did not conduct or suggest a SL assessment, despite evidence that Student struggled on the WJ-III in the areas of vocabulary, expressive and receptive language, and verbal reasoning.

13.     Here, the evidence established through the credible testimony of Dr. Gunn, Ms. Sandoval, and Mr. Jones, that Dr. Hylton did not use a sufficient variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information from the parents as required by Education Code section 56320. Instead, Dr. Hylton relied on single measures for each area that she assessed, including the WJ-III for academics, the BASC-II for attention and behavior, the Incomplete Sentences test to rule out a reading disorder, and the KBIT2 to verify cognitive abilities. She did not interview Parents, other than to give Father the BASC-II questionnaire and she only interviewed one teacher, Mr. Prescott.

14.     The evidence established that Student's scores on the WJ-III that were or should have been available to the March 5, 2012 IEP team were not reliable or complete. When rescored by Ms. Davis, Student's scores decreased on several subtests and increased in reading fluency. Neither Mr. Prescott nor Ms. Davis credibly explained why some scores reported on Ms. Davis' rescored summary were not included on the original summary. Dr. Hylton did not include all of Student's scores on the WJ-III in her report. District offered no persuasive evidence that the IEP team saw all of the WJ-III scores or that the IEP team considered and reviewed all the scores. Although Dr. Hylton testified that her custom and practice was not to report all scores in her report, the evidence established that Student's scores were significantly discrepant on several of the subtests with his KBIT2 scores and his academic history and, therefore, they should have been reported. As a result of the above, Parents, and the District members of the IEP team, did not have the full or accurate picture of Student's academic testing, and they could not have had a meaningful discussion of Student's academic needs.

15.     Dr. Hylton did not use technically sound instruments to assess whether Student had a SLD or unique needs in reading. Dr. Hylton testified that she ruled out a SLD in reading based upon Student's scores on the Incomplete Sentences test, along with a review of

EXHIBIT "A"

Student's records. Dr. Gunn and Mr. Jones persuasively testified that Dr. Hylton's use of the Incomplete Sentences test to rule out a reading disorder was inappropriate.

16.     Similarly, the evidence established that Dr. Hylton relied primarily on the WJ-III scores to rule out a SLD in math, even though Student's scores demonstrated discrepancies in Student's math scores and his cognitive abilities. Although Dr. Hylton testified that she also relied on Student's prior records, Student's recorded academic history of struggling in math, including his then failing Algebra grade, should have caused her to consider giving additional academic assessments to rule out a SLD or unique needs in math, which she did not.

17.     Based upon the cumulative evidence discussed above, Dr. Hylton's assessment did not assess Student in all areas of suspected need, did not use an appropriate variety of tools to obtain relevant information, and relied on a single inappropriate assessment tool to determine whether Student had a reading disorder. Moreover, the WJ-III was not properly administered or scored due to the inexperience of the assessor. The failure to properly assess Student in all areas of suspected disability resulted in an IEP that did not address Student's needs.

18.     Because the IEP team did not have an accurate, reliable or sufficiently comprehensive triennial assessment before it at the March 5, 2012 meeting it could not appropriately or fully consider whether Student had additional unique needs that needed to be addressed at that meeting. Therefore, District's March 5, 2012 psychoeducational assessment was not appropriate and Student is entitled to an IEE at public expense. To the extent Student raised overlapping issues that may result in the award of an IEE in this proceeding, they will be discussed in detail below. (Factual Findings 1 through 75; Legal Conclusions 1, 3 through 18.)

### *Issues 2(a)(1) and 2(a)(2) – Assessments in All Areas of Suspected Disability*

19.     In Issues 2(a)(1) and 2(a)(2), Student contends that he was denied a FAPE from May 10, 2010 through May 10, 2012 when the complaint was filed because during that time he was not appropriately assessed in all areas of suspected need, including intellectual functioning; attention/concentration/executive functioning; informational processing including language processing, development and use and visual/perceptual skills; memory functioning, including verbal memory and non-verbal memory; gross and fine motor functioning, sensory integration, social/emotional functioning, and transition needs; academic functioning; and language and communication. District contends that at all times Student was appropriately assessed in all areas of suspected disability.

20.     Legal Conclusions 1 and 3 through 8 are incorporated by reference.

21.     A child with a disability has the right to a FAPE under the IDEA. (20 U.S.C. § 1412(a)(1)(A); Ed. Code, §§ 56000, 56026.) FAPE means special education and related services that are available to the student at no cost to the parent or guardian, that meet the

EXHIBIT "A"

state educational standards, and that conform to the student's IEP. (20 U.S.C. § 1401(9); Ed. Code, § 56031; Cal. Code Regs., tit. 5, § 3001, subd. (o).) The term "related services" (in California, "designated instruction and services"), includes transportation and other developmental, corrective, and supportive services as may be required to assist a child to benefit from education. (20 U.S.C. § 1401(26); Ed. Code, § 56363, subd. (a).)

22.    In *Rowley, supra,* 458 U.S. at page 201, the Supreme Court held that "the 'basic floor of opportunity' provided by the [IDEA] consists of access to specialized instruction and related services which are individually designed to provide educational benefit to" a child with special needs. Rowley expressly rejected an interpretation of the IDEA that would require a school district to "maximize the potential" of each special needs child "commensurate with the opportunity provided" to typically developing peers. (*Id.* at p. 200.) Instead, *Rowley* interpreted the FAPE requirement of the IDEA as being met when a child receives access to an education that is reasonably calculated to "confer some educational benefit" upon the child. (*Id.* at pp. 200, 203-204, 207; *Park v. Anaheim Union High School Dist., et al.* (9th Cir. 2006) 464 F.3d 1025, 1031.) The level of benefit must be meaningful. (*Polk v. Susquehanna Intermediate Unit 16* (1988) 853 F.2d 171, 179, *citing Rowley, supra,* 458 U.S. at p. 192.)

23.    No one test exists for measuring the adequacy of educational benefits conferred under an IEP. (*Rowley, supra,* 458 U.S. at pp. 202, 203 fn. 25.) A student may derive educational benefit under Rowley if some of his goals and objectives are not fully met, or if he makes no progress toward some of them, as long as he makes progress toward others. A student's failure to perform at grade level is not necessarily indicative of a denial of a FAPE, as long as the student is making progress commensurate with his abilities. (*Walczak v. Florida Union Free School Dist.* (2nd Cir. 1998) 142 F.3d 119, 130; *E.S. v. Independent School Dist, No. 196* (8th Cir. 1998) 135 F.3d 566, 569; *In re Conklin* (4th Cir. 1991) 946 F.2d 306, 313; *El Paso Indep. School Dist. v. Robert W.* (W.D.Tex. 1995) 898 F.Supp.442, 449-450; *Perusse v. Poway Unified School Dist.* (S.D. Calif. July 12, 2010, No. 09 CV 1627) 2010 WL 2735759.)

24.    A school district's failure to conduct appropriate assessments or to assess in all areas of suspected disability is analyzed as a procedural denial of a FAPE. (*Park v. Anaheim Union High School Dist., et al., supra,* 464 F.3d at pp. 1031-1033.) In matters alleging procedural violations, the denial of a FAPE may only be shown if the procedural violations impeded the child's right to a FAPE, significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE, or caused a deprivation of educational benefits. (Ed. Code, § 56505, subd. (f)(2); see also *W.G. v. Board of Trustees of Target Range School Dist. No. 23* (9th Cir. 1992) 960 F.2d 1479, 1484-85 (*Target Range*).) The hearing officer "shall not base a decision solely on non-substantive procedural errors, unless the hearing officer finds that the non-substantive procedural errors resulted in the loss of an educational opportunity to the pupil or interfered with the opportunity of the parent or guardian to participate in the formulation process of the individualized education program." (Ed. Code, § 56505, subd. (j).)

25

EXHIBIT "A"

25.     A school district's failure to give parents copies of evaluations indicating a possibility of a disability and the need for further evaluations may violate the procedural requirements of the IDEA. (See *Amanda J. v. Clarke County School Dist., et al* (9th Cir. 2001) 267 F.3d 877, 891-892 (*Amanda J.*).) In *Amanda J.*, the Ninth Circuit held that, by preventing parents from fully and effectively participating in the creation of a student's IEP, the school district made it impossible to design an IEP that addressed the student's unique needs, thereby denying her a FAPE. (*Id.* at p. 894.)

26.     An IEP that will be in effect when a student turns 16 is required to contain an ITP. (20 U.S.C. § 1414(d)(1)(A)(i)(VIII); Ed. Code, § 56345, subd. (a)(8).) The ITP must include appropriate measurable postsecondary goals based upon transition assessments related to training, education, and employment and independent living skills if appropriate. (20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa); Ed. Code, § 56345, subd. (a)(8)(A).) The ITP must also list the transition services required to reach the postsecondary goals. (20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(bb); Ed. Code, § 56345, subd. (a)(8)(B).) "Transition services" means "a coordinated set of activities for an individual with exceptional needs" that: 1) "Is designed within an results-oriented process, that is focused on improving the academic and functional achievement of the individual with exceptional needs to facilitate the movement of the pupil from school to postschool activities, including postsecondary education, vocational education, integrated employment, including supported employment, continuing and adult education, adult services, independent living, or community participation"; 2) "Is based upon the individual needs of the pupil, taking into account the strengths, preferences, and interests of the pupil"; and 3) "Includes instruction, related services, community experiences, the development of employment and other postschool adult living objectives, and, if appropriate, acquisition of daily living skills and provision of a functional vocational evaluation." (20 U.S.C. § 1401(34); Ed. Code, § 56345.1, subd. (a).) Transition services may consist of specially designed instruction or a designated instruction and service. (34 C.F.R. § 300.43(b); Ed. Code, § 56345.1, subd. (b).)

27.     In resolving the question of whether a school district has offered a FAPE, the focus is on the adequacy of the school district's proposed program. (See *Gregory K. v. Longview School Dist.* (9th Cir. 1987) 811 F.2d 1307, 1314.) A school district is not required to place a student in a program preferred by a parent, even if that program will result in greater educational benefit to the student. (*Ibid.*) For a school district's offer of special education services to a disabled pupil to constitute a FAPE under the IDEA, a school district's offer of educational services and/or placement must be designed to meet the student's unique needs, comport with the student's IEP, and be reasonably calculated to provide the pupil with some educational benefit in the least restrictive environment. (*Ibid.*)

28.     A parent shall request an impartial due process hearing within two years of the date the parent knew or should have known about the alleged action that forms the basis of the complaint. The time period does not apply where a parent was prevented from requesting the due process hearing due to either 1) specific misrepresentations by the LEA that it had solved the problem forming the basis of the due process hearing request and 2) the

26

EXHIBIT "A"

withholding of information by the LEA from the parent that was required to be provided to the parent. (Ed. Code §56505, subd. (l).)

*Analysis of Issue 2(a)(1) – Psychoeducational, OT and Social/Emotional*

29.     Student did not meet his burden of persuasion that District procedurally violated the IDEA from May 10, 2010 until the time he filed his complaint by failing to assess him in the areas of intellectual functioning; attention/concentration/executive functioning; informational processing including language processing, development and use and visual/perceptual skills; memory functioning, including verbal memory and non-verbal memory; gross and fine motor functioning, sensory integration, and social/emotional functioning.

30.     For the time period May 10, 2010 through the end of the 2009-2010 school year, Student offered no credible evidence or expert testimony that he had demonstrated any unique needs in the areas of intellectual functioning; attention/concentration/executive functioning; informational processing including language processing, development and use and visual/perceptual skills; memory functioning, including verbal memory and non-verbal memory; gross and fine motor functioning, sensory integration, and social/emotional functioning that required District to conduct a assessments in those areas from May 10, 2010 until the end of the 2009-2010 school year. (Factual Findings 1 through 5, 47 through 63; Legal Conclusions 1, 3 through 7, 20 through 30.)

31.     Similarly, for the 2010-2011 school year, other than his known deficits in the area of attention, Student offered no credible evidence or expert testimony that he had demonstrated any unique needs in intellectual functioning; executive functioning; informational processing including language processing, development and use and visual/perceptual skills; memory functioning, including verbal memory and non-verbal memory; gross and fine motor functioning, sensory integration, social/emotional functioning, that would have put his IEP team on notice that required District to conduct assessments in those areas. (Factual Findings 1 through 17, 47 through·63; Legal Conclusions 1, 3 through 7, 20 through 31.)

32.     In the 2011-2012 school year, District's decision not to assess Student in visual motor processing, despite the fact that it was marked on the 2012 Assessment Plan, was of no meaningful significance because Student offered no evidence that he had unique needs that would have put the IEP team on notice that District should assess in that area. Similarly, Student offered no credible evidence or expert testimony that he had demonstrated any unique needs in gross and fine motor functioning or sensory integration, or that he required OT assessment. As discussed in Issue 1, in February 2012, District conducted a psychoeducational assessment, which should have included the areas of intellectual functioning; executive functioning; informational processing including language processing, development and use and visual/perceptual skills; memory functioning, including verbal memory and non-verbal memory, and social/emotional functioning. Notwithstanding that the psychoeducational assessment was inappropriate in some areas, Student did not meet his

27

burden of persuasion as to visual motor processing, gross and fine motor functioning and sensory integration for this time period. (Factual Findings 1 through 75; Legal Conclusions 1, 3 through 7, 20 through 33.)

33.     Regarding transition, Student turned 16 years old in January 2011 during the 2010-2011 school year. The evidence established that District did not do any transition assessments on Student until the March 5, 2012 assessment, when Dr. Hylton informally assessed Student in that area. Although assessments may be done in conjunction with developing an ITP, they are not necessarily required by IDEA.

34.     For the 2010-2011 school year, the evidence established that Student had an ITP in place, that at the February 2011 IEP team reviewed the ITP and that Student's IEP goals incorporated Student's transitional needs, including his goal of attending college and studying architecture or dentistry. Ms. Anderson credibly testified that the February 2011 IEP team had enough information before it to understand Student's post-secondary goals, and his transitional needs, including his need to complete enough credits to attend college, and his need to master math skills to study architecture. Student offered no evidence that he had other transitional needs that were not addressed by the February 2011 IEP team or during the 2010-2011 school year. Accordingly, Student did not demonstrate that he was denied a FAPE because District did not perform assessments related to developing an ITP in the 2010-2011 school year. (Factual Findings 1 through 17, 47 through 63; Legal Conclusions 1, 3 through 7, 20 through 34.)

35.     For the 2011-2012 school year, Student also did not meet his burden of persuasion that he was denied a FAPE because he was not adequately assessed for purposes of developing the ITP. The evidence established that Dr. Hylton informally interviewed Student during her assessment and reviewed his written responses to questions about his post-secondary goals. Student reported to Dr. Hylton that he wanted to go to college, he wanted to study dentistry or architecture, and he wanted to live independently. Ms. Cassady credibly testified that the March 5, 2012 IEP team had enough information before it to understand Student's post-secondary goals, and his transitional needs, including his need to complete enough credits to attend college, and his need to master math skills to study architecture. Student did not offer any expert testimony or other credible evidence that Dr. Hylton's informal assessment of Student's transition plan needs in 2012 was insufficient or inappropriate. Therefore, notwithstanding Legal Conclusion Numbers 1 through 18, which found that the March 5, 2012 Psychoeducational Assessment was not appropriate for other reasons, District did not deny Student a FAPE during the statutory period by failing to appropriately assess Student's transitional needs. (Factual Findings 1 through 75; Legal Conclusions 1 through 35.)

*Analysis of Issue 2(a)(2) – Assessment of Needs in Academics and Language*

36.     Student met his burden of persuasion that District procedurally violated the IDEA from and after May 10, 2010 until May 10, 2012 when Student filed his complaint by failing to appropriately assess him in academics and language disorders.

EXHIBIT "A"

37.    Student came to the District with a psychoeducational assessment conducted in
the spring of 2009 by another school district that listed areas of concern but did not find an
SLD. That assessment concluded that his overall general learning ability fell within low
average range. Student's "continued weakness" in vocabulary, as well as lack of work
production, appeared to be the primary focus of Student's academic difficulties. However,
during the 2009-2010 school year, Student scored below basic in ELA and math on the CST.
The March 2010 IEP team did not assess Student, but instead implemented accommodations
to academic testing by deciding that Student would take the CMA instead of the CST in ELA
because of his difficulties in English. The IEP team developed goals based upon Student's
grades and test scores and without the benefit of any updated assessments. He ended the
2009-2010 school year with a "D" in Algebra 1, Healthful Living, and English 9, and an "F"
in P.E. 1 and Biology, and with a grade point average of 0.8333. District had enough
information about Student's academic struggles during the applicable period to consider
assessing Student in academics and language by the end of the 2009-2010 school year.
Additionally, Dr. Gunn and Ms. Sandoval credibly testified that Student's unique needs in
the area of academics and language processing were most likely historic. Therefore, Student
met his burden of establishing that, from May 10, 2010 through the end of the 2009-2010
school year, District procedurally violated the IDEA by failing to assess Student in all areas
of unique need in the areas of reading, math and language to determine whether or not
additional services or supports would have been appropriate in order for Student to access his
education. (Factual Findings 1 through 5, 47 through 63; Legal Conclusions 1, 3 through 7,
20 through 37.)

38.    At the February 10, 2011 IEP meeting, the IEP team had information that
Student had D grades in several classes and failed two others at the end of 10th grade. He
scored below basic in geometry and ELA on the CST in the first semester of the 11th grade.
On the December 2010 DBE Student scored below basic in world history and geometry,
although he scored proficient in ELA and earth science. He received a grade of "F" in his
January 25, 2011 World History quiz, and a grade of "D" on his Earth Science Chapter 11
quiz. Ms. Anderson was concerned about Student's low and failing grades and that Student's
scores continued to remain below basic in math and ELA. Father also expressed his
concerns about Student's struggles with academics. However, the February 2011 IEP team
did not conduct any assessments of Student in preparation for, or as a result of, the IEP
meeting. As a result, District procedurally violated the IDEA during the 2010-2011 school
year by failing to assess Student in all areas of unique need in the areas of reading, math and
language to determine whether or not additional services or supports would have been
appropriate in order for Student to access his education. (Factual Findings 1 through 17, 47
through 63; Legal Conclusions 1, 3 through 7, 20 through 38.)

39.    Leading up to the March 5, 2012 IEP, Student failed English in the first
semester of 11th grade, he did not meet his English/writing goal, he was failing Algebra 2 at
the time of the IEP, his scores on state and district tests in the areas of math and ELA were
below basic, and he told his teachers that he was struggling in math and English, which
prompted a change to a new math teacher in the second semester of 11th grade. Parents
raised their concerns about Student's academic struggles at each IEP preceding the 2012

triennial assessment.  Dr. Hylton acknowledged that Student's score in reading fluency on the 2012 WJ-III was extraordinarily low compared to his other scores, and that it caused her concern, but she did not follow through by appropriately verifying whether the score was accurate, or by administering other available tests.  Dr. Gunn credibly testified that numerous significant discrepancies between Student's scores on the District's WJ-III and his KBIT2 scores should have been red flags to Dr. Hylton to further test Student to rule out a SLD in reading, math or both.  Dr. Hylton also acknowledged that, with the exception of Student's test scores and grades, she relied only on the Incomplete Sentences test to rule out a reading disorder, which Dr. Gunn and Mr. Jones credibly testified was not an appropriate assessment tool for that purpose.  Ms. Sandoval credibly testified that Student's academic history and test scores should have triggered concern by the March 5, 2012 IEP team that Student had deficits in expressive and receptive language and auditory memory, which she found existed during her assessment.  She credibly testified that those deficits most likely existed at the time of the March 2012 IEP, if not before.

40.     Dr. Hylton and Mr. Prescott attributed Student's low grades and academic struggles to Student's attention issues, without seriously considering other possible alternatives, including a SLD.  Dr. Hylton also disagreed with Ms. Sandoval as to Student's language needs.  However, because Dr. Gunn and Ms. Sandoval had more direct knowledge of Student's needs in reading, math and language through their comprehensive assessments, Dr. Gunn and Ms. Sandoval were more persuasive on this issue.  Additionally, even though Mr. Jones had not met Student or assessed him, Mr. Jones concurred with several of Dr. Gunn and Ms. Sandoval's opinions regarding the need for additional testing.  Student offered credible evidence that the March 5, 2012 IEP team had enough information before it that should have prompted District to conduct further assessments to rule out whether Student had additional needs in reading or math, or a language disorder.

41.     Accordingly, for the 2011-2012 school year until the time Student filed his complaint, District procedurally violated the IDEA by failing to assess Student in all areas of unique need in the areas of reading, math and language to determine whether or not additional services or supports would have been appropriate in order for Student to access his education.  (Factual Findings 1 through 75; Legal Conclusions 1, 3 through 41.)

42.     District argued in its closing brief that it had no obligation to assess Student after the February 2011 and March 2012 IEP meetings because Father consented to the IEPs, in Mr. Brostoff's presence, and because neither Father nor Mr. Brostoff requested additional assessments.  District's argument was not persuasive.  District cannot abdicate its affirmative duties under the IDEA to offer a FAPE, notwithstanding Father's consent to the IEP.  (*Target Range, supra,* 960 F.2d at pp. 1484-1485.)

43.     Under *Amanda J, supra,* 267 F.3d at p. 894, District's procedural violation was significant, and it denied Parents the opportunity to meaningfully participate in the development of Student's academic program.  Additionally, Student was deprived of a meaningful educational benefit as evidenced by Student's failure to progress beyond the ninth grade level in reading and his low and failing grades in various subjects.  Therefore,

EXHIBIT "A"

District's failure to properly assess Student in all areas of suspected need also denied Student a FAPE under *Rowley, supra,* at pages 200, 203-204, 207. Accordingly, Student is entitled to compensatory remedies, which will be discussed below. (Factual Findings 1 through 75; Legal Conclusions 1 through 43.)

> *Issue 2(b) -- PLOPS and Goals*

44.    In Issue 2(b), Student contends that he was denied a FAPE from May 10, 2010 until May 10, 2012 when he filed his complaint because his IEP's in the two years prior to filing did not contain adequate statements of his PLOPs in all areas of need, and did not contain appropriate measurable goals in those areas. District contends that at all relevant times, the contents of Student's IEP's were appropriate.

45.    Legal Conclusions 20 through 28, above, are incorporated by reference.

46.    An IEP is a written statement for each individual with exceptional needs that includes, in relevant part: 1) A statement of the individual's present levels of academic achievement and functional performance; 2) A statement of measurable annual goals, including academic and functional goals, designed to meet the student's unique needs and enable the student to be involved in and make progress in the general education curriculum; and 3) A description of the way progress on goals will be measured and reported; and 4) A statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the pupil, or on behalf of the pupil, and a statement of the program modifications or supports for school personnel that will be provided to enable the pupil to advance appropriately toward attaining the annual goals and be involved in and make progress in the general education curriculum. (20 U.S.C. § 1414(d)(1)(A); 34 C.F.R. § 300.320(a); Ed. Code, § 56345, subd. (a).) The IEP must include: a projected start date for services and modifications; and, the anticipated frequency, location and duration of services and modifications. (20 U.S.C. § 1414(d)(1)(A)(i)(VII); 34 C.F.R. § 300.320(a)(7); Ed. Code, § 56345, subd. (a)(7).) The IEP must show a direct relationship between the present levels of performance, the goals, and the educational services to be provided. (Cal. Code Regs., tit. 5, § 3040, subd. (c).)

47.    The Ninth Circuit Court of Appeals has endorsed the "snapshot" rule, explaining that the actions of the district cannot "be judged exclusively in hindsight" but instead, "an IEP must take into account what was, and what was not, objectively reasonable …at the time the IEP was drafted." (*Adams v. State of Oregon, supra,* 195 F.3d 1141, 1149.) "An IEP is a snapshot, not a retrospective." (*Id.* at p. 1149, citing *Fuhrmann v. East Hanover Bd. of Education* (3rd Cir. 1993) 993 F.2d 1031, 1041.)

48.    Student met his burden of persuasion on this issue. As discussed above, the evidence established that District failed to appropriately assess Student in all areas of unique need from and after May 10, 2010, resulting in his February 2011 and March 2012 IEP teams not having a complete, reliable and accurate picture of all of his needs, including in reading, math and language, which was required in order to develop appropriate goals for Student.

49.     The February 2011 IEP included a review of Student's PLOPs, which consisted of a recitation of Student's fall 2010 scores on the CST, which placed Student below basic in math and in science; his October 2010 DBE, in which Student scored below basic in geometry and ELA; and the December 2010 DBE, in which Student scored below basic in world history and geometry, and proficient in ELA and earth science. The PLOPs also include a review of Student's grades, including a grade of "F" on his January 25, 2011 World History quiz, and a grade of "D" on his Earth Science Chapter 11 quiz. The IEP team only reviewed two of Student's four goals, both of which Student did not meet. The IEP team reported that Student read, understood and connected essential ideas at approximately a ninth grade level, and that communication development, gross and fine motor skills, and social emotional/behavioral were "age appropriate." However, without appropriate assessments in the areas of math, reading and language, the IEP team did not have complete and accurate information about Student's PLOPs in the areas of math, reading and language to create appropriate goals in those areas to help Student access his education and make meaningful progress.

50.     The March 5, 2012 IEP included a statement of PLOPs and a review of his goals. District recited Student's scores on State and District testing, and his grades. Those were repeated in a review of Student's progress toward his four annual goals. Student continued to read, understand and connect essential ideas at approximately the ninth grade level. However, Mr. Prescott did not analyze with specificity whether Student had met the second and third short-term objectives of the math and science goals, or the goals as written, and he did not correlate Student's failing grade in Algebra 2 to his math goal. Student did not meet his writing/transition goal. The IEP team developed four new goals for Student, in reading/transition, writing/transition, Algebra 2/transition, and study skills/transition. Each goal included three short-term objectives and the language of the goal was based upon state standards for Student's grade level. However, the evidence did not support a finding that the reading, writing, and Algebra goals were calculated to meet Student's unique needs, in particular because they were broadly written. Moreover, because Student's scores on his academic assessment were not fully disclosed to the March 2012 IEP team, and they were not discussed in detail, the IEP team did not have enough information before it to develop appropriate goals for Student in the areas of reading and math. Finally, Student demonstrated weaknesses in language that District did not assess and, as a result, the IEP team did not develop any language goals.

51.     District procedurally violated the IDEA from May 10, 2010 until the time he filed his complaint by failing to appropriately assess Student. That failure resulted in incomplete PLOPs and goals resulting in his IEP teams not having a complete, reliable and accurate picture of all of his needs, including in reading, math and language. Under *Amanda J., supra,* 267 F.3d at p. 894, the procedural violation denied Parents the opportunity to meaningfully participate in the development of Student's academic program and therefore he is entitled to compensatory remedies, which will be further discussed below. (Factual Findings 1 through 75; Legal Conclusions 1, 3 through 51.)

EXHIBIT "A"

*Issue 2(c) -- Placement, services, and accommodations*

52.     In Issue 2(c)(1) and 2(c)(2), Student contends that he was substantively denied a FAPE from May 10, 2010 until May 10, 2012 when he filed his complaint because he was not provided with an appropriate placement, accommodations and related services to meet his unique needs. District disagrees, contending Student was provided a FAPE at all times.

53.     Legal Conclusions 1 and 20 through 28, above, are incorporated by reference.

54.     School districts are required to provide each special education student with a program in the LRE.  To provide the LRE, school districts must ensure, to the maximum extent appropriate: 1) that children with disabilities are educated with non-disabled peers; and 2) that special classes or separate schooling occur only if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily. (20 U.S.C. § 1412(a)(5)(A); 34 C.F.R. 300.114 (a); Ed. Code, § 56031.)

55.     In determining the educational placement of a child with a disability a school district must ensure that: 1) the placement decision is made by a group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options, and takes into account the requirement that children be educated in the LRE; 2) placement is determined annually, is based on the child's IEP and is as close as possible to the child's home; 3) unless the IEP specifies otherwise, the child attends the school that he or she would if non-disabled; 4) in selecting the LRE, consideration is given to any potential harmful effect on the child or on the quality of services that he or she needs; and 5) a child with a disability is not removed from education in age-appropriate regular classrooms solely because of needed modifications in the general education curriculum. (34 C.F.R. § 300.116).

56.     To determine whether a special education student could be satisfactorily educated in a regular education environment, the Ninth Circuit Court of Appeals has balanced the following factors: 1) "the educational benefits of placement full-time in a regular class"; 2) "the non-academic benefits of such placement"; 3) the effect [the student] had on the teacher and children in the regular class"; and 4) "the costs of mainstreaming [the student]." (*Sacramento City Unified School Dist. v. Rachel H.* (9th Cir. 1994) 14 F.3d 1398, 1404 (*Rachel H.*) [adopting in part factors identified in *Daniel R.R. v. State Board of Ed.* (5th Cir. 1989) 874 F.2d 1036, 1048-1050].

57.     If it is determined that a child cannot be educated in a general education environment, then the LRE analysis requires determining whether the child has been mainstreamed to the maximum extent that is appropriate in light of the continuum of program options. (*Daniel R.R. v. State Board of Ed., supra,* 874 F.2d at p. 1050.)  The continuum of program options includes, but is not limited to: regular education; resource specialist programs; designated instruction and services; special classes; nonpublic, nonsectarian schools; state special schools; specially designed instruction in settings other

33

EXHIBIT "A"

than classrooms; itinerant instruction in settings other than classrooms; and instruction using telecommunication instruction in the home or instructions in hospitals or institutions. (Ed. Code, § 56361.)

### Analysis of Issue 2(c)(1) -- Placement

58.     As to Issue 2(c)(1), Student did not meet his burden of persuasion or demonstrate he was denied a FAPE because his placement was inappropriate at any time.

59.     For the time period of May 10, 2010 until the end of the 2010 school year, Student offered no evidence that, under the four factors of *Rachel H.*, Student's placement was not appropriate and in the LRE.  Student received his educational instruction and had access to instruction in a general education setting with typical peers, with one period of resource support, from the time he enrolled at Palmdale.  The evidence established that, during this time frame, he received some academic and non-academic benefits from the general education setting by being educated with typical peers.  Student offered no evidence that a more restrictive setting was appropriate for him or that his presence in a general education setting had a negative effect on his teachers or classmates.  Neither party addressed the cost of mainstreaming.  Accordingly, during this time period, Student did not meet his burden of persuasion. (Factual Findings 1 through 5; Legal Conclusions 1, 20 through 59.)

60.     Similarly, for the 2010-2011 school year, Student did not meet his burden of persuasion of establishing that, under the four factors of *Rachel H.*, Student's placement was not appropriate and in the LRE.  Ms. Anderson testified that the February 2011 IEP team considered, based on the information it had available to it at the time, whether Student should be placed in a more restrictive environment in a special day class.  The IEP team ruled out that option on the continuum of placement in favor of a general education setting with one hour of resource support.  The evidence established that, with the appropriate goals and related services, Student would benefit both academically and non-academically from receiving his educational instruction in the general education setting.  Student offered no evidence that a more restrictive setting was appropriate for him or that his presence in a general education setting had a negative effect on his teachers or classmates.  Neither party addressed the cost of mainstreaming.  Although Dr. Gunn opined that Student required more resource time each week, his testimony did not rise to the level of establishing that Student's placement in the 2010-2011 school year was inappropriate or that District denied Student a FAPE in the LRE by offering an inappropriate placement.  Accordingly, Student did not meet his burden of persuasion. (Factual Findings 1 through 17, 47 through 75; Legal Conclusions 1, 20 through 60.)

61.     For the 2011-2012 school year, Student also did not meet his burden of persuasion of establishing that, under the four factors of *Rachel H.*, Student's placement was not appropriate and in the LRE or that another placement was appropriate.  The evidence established that the March 2012 IEP team considered, based upon the information available to it at the time, whether Student should be placed in a special day class and ruled that option out in favor of a general education setting with one hour of resource.  The evidence also

EXHIBIT "A"

established that, with the appropriate goals and related services, Student would benefit both academically and non-academically from receiving his educational instruction in the general education setting. Student offered no evidence that a more restrictive setting was appropriate for him or that his presence in a general education setting had a negative effect on his teachers or classmates. Neither party addressed the cost of mainstreaming. Although Dr. Gunn opined that Student required more resource time each week, his testimony did not rise to the level of establishing that Student's placement in the 2011-2012 school year was inappropriate or that District denied Student a FAPE in the LRE by offering an inappropriate placement. (Factual Findings 1 through 75; Legal Conclusions 1, 20 through 61.)

*Analysis of Issue 2(c)(2) – Accommodations and services*

62.　As to Issue 2(c)(2), Student partially met his burden of persuasion as to inclusion of related services in Student's IEP.

63.　Legal Conclusions 1, 20 through 28, 46 and 47, above, are incorporated by reference.

64.　If the IEP team determines that to provide a FAPE a child needs a particular service, intervention, accommodation or program modification, in order to make progress on annual goals, make progress in the general education curriculum or be educated with other students, the program modifications must be listed in the child's IEP. (Ed. Code, §§ 56341.1, subd. (c) & 56345, subd.(a)(4).) The IEP team must also include a statement of any individual appropriate accommodations that are necessary to measure the academic achievement and functional performance of the child on State and district wide assessments, whether and why the child cannot participate in the regular assessments and why the particular alternate assessment selected is appropriate. (34 C.F.R. § 300.321(a)(6).)

65.　Regarding accommodations, for the time period of May 10, 2010 until the end of the 2009-2010 school year, the evidence established that the March 2010 IEP included numerous instructional accommodations, and that the IEP team recommended that Student take the CMA in one subject as a test accommodation. Student offered no evidence that any of those accommodations were inappropriate. Similarly, for the 2010-2011 school year, the evidence established that the February 2011 IEP had numerous instructional and test accommodations, including preferential seating and other supports. Student offered no evidence that any of those accommodations were inappropriate. For the 2011-2012 school year, the March 2012 IEP team included multiple instructional and test accommodations in the IEP, most of which were recommended by Dr. Hylton and related to Student's attention deficits. Student offered no credible evidence that the accommodations included in the IEP were inappropriate, despite the fact that he had not been assessed in some areas of suspected disability. Accordingly, Student did not demonstrate he was denied a FAPE on this ground. (Factual Findings 1 through 75; Legal Conclusions 1, 20 through 65.)

66.　Regarding related services, from May 10, 2010 until the end of the 2009-2010 school year, Student's IEP included one period of SAI in study skills as a related service.

EXHIBIT "A"

As discussed above, during this time frame, District failed to assess Student in the areas of math, reading and language, and a result, Student's IEP team was unable to fully determine whether Student required more SAI, resource support or SL therapy, to access his education and make meaningful progress. District's failure to assess resulted in a procedural violation of the IDEA during this time period. (Factual Findings 1 through 5, 47 through 63; Legal Conclusions 1, 20 through 66.)

67.     Similarly, during the 2010-2011 school year, District offered Student one period of RSP which focused on study skills. Dr. Gunn testified that Student required more than one hour to address his deficits in math and reading. The evidence established that District failed to appropriately assess Student during this time frame; that, through Dr. Gunn's and Ms. Sandoval's testimony, Student demonstrated needs in reading, math and language in the 2010-2011 school year that most likely existed in the 2010-2011 school year; and that Student should have received more resource support and SL therapy. District's failure to assess Student in those areas during this time frame resulted in the February 2011 IEP team's inability to fully determine whether Student required additional related services, including more resource support and SL therapy, resulting in a procedural violation of the IDEA. (Factual Findings 1 through 17, 47 through 63; Legal Conclusions 1, 20 through 67.)

68.     For the 2011-2012 school year, District offered Student one period of resource support, which in Dr. Gunn's opinion was insufficient to address Student's unique needs in the areas of math and reading. Ms. Sandoval opined that Student had unique needs in the area of language and that he required SL therapy to address those unique needs. As discussed above, District's March 5, 2012 psychoeducational assessment was not appropriate, and District failed to assess Student in the area of SL. District's failure to appropriately assess Student in the areas of reading, math and language during this time frame resulted in the March 2012 IEP team's inability to fully determine whether Student required additional related services, including more resource support and SL therapy, resulting in a procedural violation of the IDEA. (Factual Findings 1 through 75; Legal Conclusions 1, 3 through 68.)

69.     As discussed above, under *Amanda J., supra,* 267 F.3d at p. 894, District's procedural violation, which was significant, denied Parents the opportunity to meaningfully participate in the development of Student's academic program, specifically the inclusion of appropriate related services in his IEP's. Accordingly, he is entitled to compensatory remedies, which will be discussed below. (Factual Findings 1 through 75; Legal Conclusions 1, 3 through 69.)

*Issue 2(d) -- ESY*

70.     In Issue 2(d), Student contends he was denied a FAPE throughout the two year statute of limitations period because his operative IEP's did not include an offer of ESY. District contends ESY was not required to provide a FAPE.

EXHIBIT "A"

79.     As discussed above, District failed to meet its burden on Issue 1, and therefore Student is entitled to a psychoeducational IEE at public expense. Student also demonstrated in Issues 2 (a)(2), 2(b) and partially in 2(c)(2) that District failed to appropriately assess him in the areas of math, reading and language from May 10, 2010 until the time he filed his complaint, resulting in a denial of FAPE. Under *Burlington, supra*, 471 U.S. at pp. 369-371, a hearing officer has the discretion to award equitable remedies, which in this case includes reimbursement for IEE's and compensatory remedies.

80.     Here, Father independently retained Dr. Gunn to perform the pyschoeducational assessment after District filed its due process complaint in response to his request for an IEE by Dr. Gunn. Father now seeks an order that District pay for Dr. Gunn's IEE. District contends that Student is not entitled to reimbursement for Dr. Gunn's IEE because Dr. Gunn's IEE was conducted in preparation for hearing only after District filed its due process complaint. Ordering District to pay for another psychoeducational assessment would be impractical and redundant under the circumstances here. Accordingly, the equities dictate that Father should be reimbursed for Dr. Gunn's IEE rather than ordering District to pay for a new psychoeducational IEE. Father submitted an invoice from Dr. Gunn addressed to Father dated November 25, 2012, for $4,800. Dr. Gunn was qualified to assess Student, he conducted a thorough assessment including a review of Student's educational history, and his conclusions were credible. Dr. Gunn credibly testified that the rate he charged for Student's assessment was within the range of his usual and customary fee for private clients. Although Student did not offer evidence that Dr. Gunn's invoice was paid or who paid the invoice, in his closing brief he requested that District pay Dr. Gunn directly. Student is entitled to recover the cost of Dr. Gunn's assessment from District in the amount of $4,800. Accordingly, because this decision awards Student reimbursement as a remedy for Issues 2(a)(2), 2(b), and the related services claim in Issue 2(c)(2), District need not provide Student an IEE at public expense in response to Student's request.

81.     Student also seeks an order that compels District to pay for Ms. Sandoval's SL assessment, obtained by Father. District argued in its closing brief that Ms. Sandoval's assessment was redundant and unnecessary because District offered in the fall of 2012, in response to Student's request for a SL IEE, to conduct a SL assessment of Student; because Father agreed to the assessment; and because District's assessment was underway at the time of the hearing. Therefore, District argues that it should not be obligated to pay for Ms. Sandoval's assessment. District's argument is not persuasive when the equities are considered. Its offer to assess Student in SL came more than six months after the inappropriate and incomplete March 5, 2012 triennial assessment, and four months after Student filed his due process complaint. Ms. Sandoval assessed Student in September 2012, shortly after Student's request to District. Ms. Sandoval was qualified to assess Student, she conducted a thorough assessment including a review of Student's educational history, and her conclusions and recommendations were credible. As discussed above, the hearing officer has the discretion to award appropriate equitable remedies, which in this case includes reimbursement for Ms. Sandoval's IEE. Father submitted an invoice from Ms. Sandoval for $1,000, which was reasonable based upon the assessment she conducted. Although Student did not offer evidence that Ms. Sandoval's invoice was paid or who paid the invoice, in his

EXHIBIT "A"

71.     Legal Conclusions 1, 20 through 28, 46 and 47, above, are incorporated by reference.

72.     ESY shall be provided for each individual who has unique needs and requires special education and related services in excess of the regular academic year. Such individuals shall have handicaps which are likely to continue indefinitely or for a prolonged period, and interruption of the pupil's educational programming may cause regression, when coupled with limited recoupment capacity, rendering it impossible or unlikely that the pupil will attain the level of self-sufficiency and independence that would otherwise be expected in view of his or her handicapping condition. ESY, if determined by the IEP team to be needed, must be included in the student's IEP. (34 C.F.R. § 300.106; Cal. Code Regs, tit. 5, § 3043.)

73.     Student did not meet his burden on this issue. Student offered no evidence or expert testimony at the hearing regarding ESY. Student offered no evidence that he would regress or had regressed without ESY, or that he had any unique needs that would have required District to offer ESY as a related service from May 10, 2010 through 2012 ESY. (Factual Findings 1 through 75; Legal Conclusions 1, 20 through 28, 70 through 73.)

*Remedies*

74.     Student prevailed on Issues 1, 2(a)(2), 2(b), and the related services claim in Issue 2(c)(2), and he is therefore is entitled to the remedies discussed below.

75.     Legal conclusion number 8 is incorporated by reference.

76.     Parents may be entitled to reimbursement for the costs of services they have procured for their child when the school district has failed to provide a FAPE, the services were appropriate under the IDEA, and replaced services that the school district failed to provide. (20 U.S.C. § 1412(a)(10)(C); *School Committee of Burlington v. Department of Education* (1985) 471 U.S. 359, 369-371 [1055 S.Ct. 96] (*Burlington*).)

77.     When a school district fails to provide a FAPE to a student with a disability, the student is entitled to relief that is "appropriate" in light of the purposes of the IDEA. (*Burlington, supra*, 471 U.S. at pp. 369-371; 20 U.S.C. § 1415(i)(2)(C)(3).) School districts may be ordered to provide compensatory education or additional services to a student who has been denied a FAPE. (*Student W. v. Puyallup School Dist.* (9th Cir. 1994) 31 F.3d 1489, 1496.) These are equitable remedies that courts may employ to craft "appropriate relief" for a party. Appropriate relief means "relief designed to ensure that the student is appropriately educated within the meaning of the IDEA." (*Id.* at p. 1497.) An award of compensatory education need not provide a "day-for-day compensation." (*Ibid.*)

78.     An independent educational evaluation at public expense may also be awarded as an equitable remedy if necessary to grant appropriate relief to a party. (*Los Angeles Unified School Dist. v. D.L.* (C.D.Cal. 2008) 548 F.Supp.2d 815, 822-823.)

EXHIBIT "A"

closing brief he requested that District pay Ms. Sandoval directly. For the reasons discussed above, Student is entitled to recover the cost from District in the amount of $1,000. District is relieved of any burden to provide an additional IEE in speech language at public expense because Student is receiving reimbursement for one in this hearing.

82.    Student also seeks compensatory services in the form of SL services and educational therapy. The evidence established that, at the time of the hearing, Student was nearing the end of his high school education and he required intensive support to help him develop new skills and recapture lost skills in math, reading and phonemic language to meaningfully access his education. Dr. Gunn and Ms. Sandoval recommended that Student would benefit from an educational program that included two hours a week of educational therapy, two hours a week of SL services, and 100 hours of compensatory SL and 200 hours of compensatory educational therapy, all focused on Student's educational weaknesses as determined by their assessments, including their review of Student's academic history. District argued that Dr. Gunn was not an educational psychologist and had no experience in school psychology and therefore his recommendations were not credible. District also argued that Ms. Sandoval's recommendations were not credible because she did not observe Student in the school setting or talk with his teachers. District's arguments were not persuasive. As discussed above, Dr. Gunn and Ms. Sandoval's testimony was credible and established that Student had historic deficits that required remediation.

83.    District did not offer any evidence of alternative amounts of compensatory educational services that it considered would be more reasonable than the services recommended by Dr. Gunn and Ms. Sandoval. Therefore, given the limited time Student has left in high school, 200 hours of educational therapy services and 100 hours of SL services as recommended by Student's experts is reasonable. However, supplementing those hours with four additional hours a week of related services in educational therapy and SL during the school day until the end of the school year would be excessive based on the cumulative evidence. Accordingly, District shall fund compensatory education for Student consisting of a block of 200 hours of educational therapy in math and reading, and 100 hours in SL, in accordance with the recommendations by Dr. Gunn and Ms. Sandoval. In addition, Student's IEP team shall meet and implement additional goals for the remainder of the 2012-2013 school year, consistent with Dr. Gunn's and Ms. Sandoval's recommendations.

## ORDER

1.    District's March 5, 2012 psychoeducational assessment was not appropriate, such that District is required to fund an IEE at public expense.

2.    District shall directly pay the cost of the independent educational assessment conducted by Dr. Timothy Gunn in the amount of $4,800, within 30 days of the date of this decision. If the invoice has been paid by the date of this Decision, then District shall reimburse the payer within 30 days of receipt of proof of payment. Reimbursement as indicated by this order fulfills District's duty to provide an IEE at public expense.

EXHIBIT "A"

3.      District shall directly pay the cost of the independent educational assessment conducted by Lisa Sandoval in the amount of $1,000, within 30 days of the date of this decision. If the invoice has been paid by the date of this Decision, then District shall reimburse the payer within 30 days of receipt of proof of payment. District is relieved of any burden to provide an additional IEE in speech language at public expense for purposes of the issues raised in Student's complaint.

4.      District shall hold an IEP team meeting within 30 school days after this Decision is issued to develop educational goals in the areas of reading, writing and language that are consistent with the recommendations of Dr. Gunn and Ms. Sandoval, unless the IEP team members otherwise mutually agree. Dr. Gunn and or Ms. Sandoval may participate in the IEP specified in this paragraph at Student's invitation and at Student's expense without right of reimbursement from District.

5.      District shall provide Student with the following related services as compensatory education, which Student shall have access to so long as he resides within District's geographic boundaries until the block of hours is exhausted, or until May 31, 2014, whichever comes first:

a.      200 hours of educational therapy in the areas of math and reading to be provided by a credentialed teacher who is qualified to instruct in the areas of math and reading and who is employed by the District or, if one is not available, then by a non-public agency of District's choosing;

b.      100 hours of SL therapy to be provided by a licensed speech therapist employed by the District or, if one is not available, then by a non-public agency of District's choosing;

c.      The above-referenced services shall be provided in accordance with the recommendations of Ms. Sandoval and Dr. Gunn, as stated in their reports dated September 18, 2012and November 18, 2012 , respectively.

d.      If Student fails to use any of the compensatory hours provided in this paragraph, or if he fails to appear, cancels without at least 24 hours' notice, or otherwise misses any previously scheduled session provided for in 5 (a) and 5 (b) by no fault of the provider, then Student shall not be entitled to make up missed sessions, unless otherwise mutually agreed upon by Student and the provider.

e.      If District chooses a non-public agency to provide the compensatory hours of service described in this Order, District shall provide mileage reimbursement at the prevailing Internal Revenue Service mileage rate for round trip transportation from home to the non-public agency if Student's so requests.

EXHIBIT "A"

## PREVAILING PARTY

Education Code section 56507, subdivision (d), requires that this Decision indicate the extent to which each party prevailed on each issue heard and decided in this due process matter.  Student prevailed in Issues 1, 2(a)(2), 2(b), and the related services portion of Issue 2(c)(2).  District prevailed on Issues 2(a)(1), 2(c)(1), the accommodations portion of Issue 2(c)(2), and 2(d).

## RIGHT TO APPEAL THIS DECISION

This is a final administrative decision, and all parties are bound by it.  Pursuant to Education Code section 56506, subdivision (k), any party may appeal this Decision to a court of competent jurisdiction within ninety days of receipt.

Dated:  February 11, 2013

_____
ADRIENNE L. KRIKORIAN
Administrative Law Judge
Office of Administrative Hearings

41

EXHIBIT "A"

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )

JOSE BANDA, MANUEL BANDA and LORENA BANDA

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

ANTELOPE VALLEY UNION HIGH SCHOOL DISTRICT

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

HENRY TOVMASSIAN, SBN 140388
LAW OFFICES OF HENRY TOVMASSIAN
14001 Ventura Boulevard
Sherman Oaks, CA 91423          Telephone: (818) 990-7722

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☒ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government Defendant

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding   ☐ 2. Removed from State Court   ☐ 3. Remanded from Appellate Court   ☐ 4. Reinstated or Reopened   ☐ 5. Transferred from Another District (Specify)   ☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes ☒ No   (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No   ☒ MONEY DEMANDED IN COMPLAINT: $ $230,000

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
COMPLAINT FOR ATTORNEYS' FEES AND EXPENSES UNDER THE INDIVIDUALS WITH DISABILITIES EDUCATION ACT, 20 U.S.C. § 1400 et seq.

**VII. NATURE OF SUIT** (Place an X in one box only).

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accomodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☒ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY:** Case Number:   CV13-03358

AFTER COMPLETING PAGE 1 OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED ON PAGE 2.

CV-71 (02/13)                    CIVIL COVER SHEET                    Page 1 of 2

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES**: Has this action been previously filed in this court and dismissed, remanded or closed? ☒ NO ☐ YES

If yes, list case number(s): _____

**VIII(b). RELATED CASES**: Have any cases been previously filed in this court that are related to the present case? ☒ NO ☐ YES

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)  ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.

☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.

☒ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**NOTE: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

*Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved.

**X. SIGNATURE OF ATTORNEY (OR SELF-REPRESENTED LITIGANT):** _Hilul Gudaatsc_ **DATE:** 5/9/2013

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

Name & Address:
Henry Tovmassian, SBN 140388
Law Offices of Henry Tovmassian
14001 Ventura Blvd., Sherman Oaks, CA 91423
(818) 990-7722-Tel.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| JOSE BANDA, MANUEL BANDA and LORENA BANDA<br><br>PLAINTIFF(S)<br>v.<br><br>ANTELOPE VALLEY UNION HIGH SCHOOL DISTRICT<br><br>DEFENDANT(S). | CASE NUMBER<br><br>**CV13-03358 -FFM**<br><br><br>**SUMMONS** |
| --- | --- |

TO:   DEFENDANT(S):

A lawsuit has been filed against you.

Within ___21___ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _Henry Tovmassian, Esq._____, whose address is _14001 Ventura Blvd., Sherman Oaks, CA 91423_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: _MAY 10 2013_____

By: _____
Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*